# PEURIFOY *v.* CONGRESSIONAL MOTORS, INC.

[No. 262, September Term, 1968.]

*Decided July 2, 1969.*

502

*Motion for rehearing filed August 4, 1969; denied September 8, 1969.*

The cause was argued before HAMMOND, C. J., and BARNES, FINAN, SINGLEY and SMITH, JJ.

*William F. Hickey* for appellant.

*Joseph A. Lynott, Jr.* for appellee.

BARNES, J., delivered the opinion of the Court.

The Circuit Court for Montgomery County (Moorman, J.) on March 6, 1968, granted the motion of the appellee, Congressional Motors, Inc., the defendant below, to direct the verdict in its favor at the end of the case of the plaintiff below, David G. Peurifoy, the appellant here, on all three counts of the declaration. A motion for a new trial was filed and after a hearing was overruled by the trial court on July 2, 1968, when judgment for the defendants for costs was duly entered. The trial court filed a written opinion indicating its reasons for overruling the motion for a new trial. The plaintiff filed a timely appeal from that judgment. The three counts were to recover damages (1) for an alleged libel, (2) for an alleged breach of contract, and (3) for an alleged fraud.

The testimony produced by the plaintiff below indicated the following: Mr. Peurifoy, aged 49, had been employed in the financial management of automobile retail sales agencies for between 18 and 19 years prior to his employment by Congressional Motors in April, 1966. He had been employed during this time by well-known, large retail automobile sales agencies including Ourisman Chevrolet and Jim McKay Chevrolet as general manager and comptroller. He left the employment of those corporations of his own volition or because of circumstances be-

yond his control, but in no instance was his employment terminated because of his employer's dissatisfaction with his service.

During the early part of April 1966, Robert Davis, an employee of Congressional Motors, communicated with Mr. Peurifoy in order to ascertain whether he knew of any qualified person who might be interested in filling a vacancy in the position of comptroller or general manager of Congressional Motors. After subsequent discussion with Mr. Davis, inquiry was made by Mr. Peurifoy in regard to the details of the vacant position and he then indicated to Mr. Davis that he, himself, might personally be interested in filling the position. Thereafter an appointment was arranged for a meeting between T. J. Whalen, vice president of Congressional Motors and Mr. Peurifoy, which took place in Mr. Whalen's office during the first half of April 1966. No one other than Mr. Whalen and Mr. Peurifoy was present at this meeting. Discussion was had in regard to the details of the employment, including duties and salary, and a second meeting was arranged to reach a final agreement in the matter. This second meeting occurred a few days later in the same place between Mr. Whalen and Mr. Peurifoy. Mr. Peurifoy testified that a yearly salary of $15,000 for the remainder of 1966 and a salary for the year 1967 was fixed at $20,000, but no written agreement was prepared or executed by the parties. On cross-examination, Mr. Peurifoy testified as follows:

"Q. And at that time you discussed the financial arrangements with Mr. Ted Whalen? A. That's right, sir.

"Q. Did you tell him you had been receiving $200.00 a week draw at McKay Chevrolet? A. I possibly told him that I had drawn $200.00 a week at McKay. I told him what I earned, also, the prior year.

"Q. He offered you then $230.00 a week? A. That's right, sir.

"Q. What did you say to that? A. I told him, asked him if he could make it two and a half.

"Q. What did he say? A. He said okay.

"Q. Did you ask him anything about a car? A. Yes, sir.

"Q. What did you say about the car? A. A car was furnished.

"Q. You asked him would he furnish a car? A. Yes, sir.

"Q. What did he say? A. Said okay.

"Q. How about the maintenance to that car, the gas and oil and the general overhaul and maintenance? A. The company gave me an agreement on it.

"Q. The employer was to take care of that? A. That's right, sir.

"Q. Then you stated that you told him that you wanted $15,000.00 for the year 1966? A. That's right, sir.

"Q. And he stated you would possibly do better, is that correct? A. That's right, sir.

"Q. What else did he say? A. Best of my knowledge he said I would do better.

"Q. Did he ever say to you, Mr. Peurifoy, 'I guarantee you $15,000.00 in the balance of the year 1966 and I guarantee you $20,000.00 for the year 1967?' A. No, sir. He did not say this.

"Q. But the extent of it was that he told you —quote — you would possibly do better? A. That's right.

"Q. And that was the extent of your conversation on your fifteen thousand and on your twenty thousand? A. That's right.

"Q. You are claiming that you had an employment contract with Congressional Motors which was to run from April of 1966 through at least the end of year 1967 and you were to be paid fifteen thousand in '66 and twenty thousand in '67; is that correct? A. That's correct."

Mr. Peurifoy further testified that the books and records of Congressional Motors were in "deplorable" condition and that he worked quite hard and put in long hours to get them in good order. In October of 1966, Edward F. Belloff, a certified public accountant of the accounting firm of Belloff and Thompson, was brought in by Congressional Motors to assist Mr. Peurifoy in working on the books and records of the corporation. Mr. Belloff continued to work on the books and records until December 1966, when he rendered a statement—but not a certification—to Congressional Motors.

Just prior to Christmas 1966, Mr. Whalen called Mr. Peurifoy into his office and directed him to draw a check for $250.00 to Mr. Peurifoy's order as his year-end bonus. Mr. Peurifoy testified that he stated that "this is not the way I was hired" and then he and Mr. Whalen sat down in Mr. Whalen's office and "went over the entire matter again as to our discussion originally when I went there in April." After the holidays, Mr. Whalen and Mr. Peurifoy again discussed the matter and Mr. Whalen offered him $500. Mr. Peurifoy told Mr. Whalen that he would take the $500 "with no strings attached," by which he meant that he "didn't want it classified as a year-end bonus or final pay." He then drew a check for $500 to his order and used it in regular course.

Mr. Whalen had a key to Mr. Peurifoy's desk, which was kept locked. Mr. Peurifoy noticed that his desk had been entered but when he asked Mr. Whalen about it, Mr. Whalen admitted he had been into the desk but when asked what he was looking for, replied, "Nothing."

Mr. Peurifoy went home from work at lunch time on January 16, 1967. He testified: "* * * I was tired, highly nervous and physically—I never had this happen to me before—I just fell apart. I was sobbing. I was just completely exhausted." Mrs. Peurifoy telephoned Congressional Motors and said that her husband was not returning. On Friday, January 20 an employee called and told Mr. Peurifoy that Mr. Whalen wanted to see him on Sat-

urday morning and asked him to come by the office. He did this and on Saturday, January 21, 1967, Mr. Whalen came in and handed Mr. Peurifoy a letter with two checks attached. Mr. Whalen stated "there was no need to go into a detail, that he thought the letter would be self-explanatory." The letter was as follows:

"Congressional Motors, Incorporated
* * *

January 21, 1967

"Mr. David G. Peurifoy
609 Warfield Drive
Rockville, Maryland
"Dear Mr. Peurifoy:

"I am glad to hear that you did not have a nervous breakdown and that you are feeling better again.

"When you left on Monday, January 16, 1967, we had occasion to go into your desk seeking information and were shocked at what we found. Listed below, in some detail, is a bill of particulars. This is without a thorough review of all the records, but it would indicate we will probably find a great deal more:

Cash Drawer overage, January 12, 1967 — $306.00

Undeposited Checks payable to Congressional Motors, dating back at least 3 months — $5207.82

R.O.'s with releases and subrogation signed by customers dating back to June 6, 1966

Accounts Receivable exceeding $30,000.00
No effort to collect

Many R.O.'s left in drawers in general confusion

AFA's not reconciled

"Obviously, this cannot be tolerated in any place of business. I am therefore forced to terminate

your service with this company effective this date.

"I do want you to know that we appreciate your efforts and extend my best wishes for your future.

Sincerely yours,
/s/ T. J. Whalen
Vice President

"TJW/ap"

On cross-examination, Mr. Peurifoy testified that the AFA's (Automotive Factory Adjustment) were not reconciled, that there was a cash drawer overage; that uncashed checks were in his drawer, and that a number of R.O.'s (repair orders) remained unprocessed on his desk, but on redirect examination, he denied these matters. He conceded, however, that during the entire period of his employment, he never reconciled the bank statements of Congressional Motors, for the reason, he stated, that the Company failed to deliver the bank statements to him.

Mr. Peurifoy testified on cross-examination in regard to the cash drawer overage as follows:

"Q. You had a returned check in your cash drawer with $30.00 in cash attached to this returned check? A. That's right, sir.

"Q. You had another returned check in your drawer with $60.00 attached to it? A. That's right, sir.

"Q. What was this cash? How did that cash get in your drawer? A. The cash came from the customer.

"Q. These were payments on— A. —on, toward the checks.

"Q. Toward the checks? A. If I had given the customer a receipt for this money at the time I would have voided our charge against them as far as the bad check charge goes.

"Q. These customers were paying on their bad checks? A. That's right, sir.

"Q. And you were not going to deposit the cash that they gave you until they redeemed the full amount of the check? A. That's right, sir. Management knew I was doing this in both instances.

"Q. Did you ever consider depositing this cash into the bank account of the corporation and putting a notation that you were applying it in payment of a bad check? A. No, sir.

"Q. You never thought of that? A. No, sir."

Mr. Peurifoy admitted that Mr. Whalen at no time indicated that he doubted Mr. Peurifoy's integrity or honesty. He stated that he obtained employment in the same type of work subsequent to January 21, 1967, having gone to work for Ourisman Chevrolet on February 21, 1967. Thereafter he was employed by Bethesda—Lincoln-Mercury from September 11, 1967 to February 1, 1968, and thereafter by Bill Bagley Lincoln-Mercury (which took over the agency on February 1) until the time of the hearing in the case.

The plaintiff called Mrs. Ann Picot, who testified that she was a title clerk and secretary to Mr. Whalen; that she typed the letter of January 21, 1967, and knew its contents; and, that the only copy of the letter was delivered to Mr. Whalen.

Mr. Belloff was also called as a witness by the plaintiff. He testified that he found Mr. Peurifoy to be cooperative and agreed that the books of Congressional Motors were in poor condition. He also testified that during the period of Mr. Peurifoy's employment by Congressional Motors the accounts receivable were not "in very good condition," there was improper coding on the AFA accounts which were also not reconciled; that there was improper coding of the customer deposit accounts; and, that there were improper records on the leased car accounts. He further stated that there had been "some improvement" of the books during the period of Mr. Peurifoy's employment but that the "improvement was not as much as it

probably should have been." He further stated that Mr. Peurifoy's procedure for handling the cash drawer overages and the bad check payments were not in accord with good accounting practice.

Also introduced into evidence by the plaintiff, over the objection of the defendant, was an "Employment Verification Request" allegedly signed by T. J. Whalen on June 11, 1966, and delivered by Mr. Peurifoy to Weaver Bros., Inc., in connection with his application for a mortgage loan which reads, in part, "First Years Salary to be Min. of $15,000.00 with a Max. of $20,000.00." The form also indicates that Mr. Peurifoy was "Asst. Gen. Manager," was employed on April 27, 1966" and in the block entitled "Present rate of pay" is the notation under "Annual" of $13,000.00.

As we have indicated, the declaration—filed on June 2, 1967—contained three counts. Count I recited a portion of the letter of January 21, 1967, charged Congressional Motors through its vice president, T. J. Whalen, with having maliciously prepared it, that it was dictated to Mr. Whalen's secretary and that it greatly injured the plaintiff's reputation. This libel count claimed $100,000 compensatory damages and $100,000 punitive damages. Count II recited the alleged agreement to pay $15,000 in salary and bonuses for 1966 and $20,000 for 1967, with a failure to pay more than $9,250 for 1966 leaving a balance due of $5,750 for that year and the entire $20,000 for 1967 because of the unwarranted termination of January 21, 1967. Damages of $25,750 and costs were claimed. Count III alleged that the plaintiff was induced to leave his former employment by the promise of Congressional Motors to pay $15,000 for 1966 and $20,000 for 1967 but that the company did not intend to pay such salaries at the time, knew the plaintiff would rely on the promise to his detriment which the plaintiff did so that there was a false inducement resulting in $50,000 compensatory damages which the plaintiff claimed together with an additional $50,000 in punitive damages.

The defendant pleaded the general issue pleas in tort

and in contract, but there was no plea of justification filed to Count I.

Also, as we have indicated, the trial court directed the verdict in favor of the defendant on all three counts and explained to the jury why he was taking that action. In our opinion the trial court acted properly in directing the verdict and we shall affirm the judgment for the defendant, Congressional Motors, for costs.

### (1)

We shall first consider the claim for libel in Count I.

The statements in the letter of January 21, 1967, were not libelous *per se*. They did not charge Mr. Peurifoy with the commission of a crime and the letter on its face indicates no malice on the part of Congressional Motors. On the contrary, the letter begins with the statement "I am glad to hear that you did not have a nervous breakdown, and that you are feeling better again." It ends with the statement: "I do wish you to know that we appreciate your efforts and extend my best wishes for your future." The letter was not read or shown to others. Mr. Peurifoy obtained employment with Ourisman Chevrolet on the following February 21 and stated that so far as he knew, Congressional Motors had not notified Ourisman of "what existed" in his prior employment with Congressional Motors. The matters complained of in the letter of January 21 were confirmed, in part, by Mr. Peurifoy, himself, in his cross-examination and also, in part, by the testimony of Mr. Belloff, who was called as a witness by Mr. Peurifoy and by whose testimony he was bound in so far as it was not impaired or contradicted. Cf. *Williams v. Wheeler*, 252 Md. 75, 249 A. 2d 104 (1969); *Nizer v. Phelps*, 252 Md. 185, 249 A. 2d 112 (1969); *Trusty v. Wooden*, 251 Md. 294, 247 A. 2d 382 (1968); *Vokroy v. Johnson*, 233 Md. 269, 196 A. 2d 451 (1964). Indeed, Mr. Peurifoy conceded that Mr. Whalen never impugned his honesty or integrity, so that he obviously did not consider the contents of the letter of January 21 as having impugned his honesty or integrity.

The letter of January 21, 1967, was written and presented to Mr. Peurifoy, an employee of Congressional Motors, subject to a qualified or conditional privilege. In *Stevenson v. Baltimore Baseball Club, Inc.*, 250 Md. 482, 243 A. 2d 533 (1968), Stevenson and three fellow employees were discharged by their employer, Baltimore Baseball Club, whose agent told them: "Fellows, I'm going to make this short and sweet, I feel as though I cannot trust you any longer, turn your badges over to Mr. Philburn." In the ensuing slander action by Stevenson, the trial court directed a verdict in favor of the employer and we affirmed on appeal. Judge Singley, for the Court, stated:

> "It has long been recognized that certain communications may enjoy a qualified or conditional privilege. As Baron Parke said, in *Toogood v. Spyring*, 1 C. M. & R. 181, 193, 149 Eng. Rep. 1044 (1834), where suit for alleged defamation was brought by a journeyman carpenter against a tenant of the Earl of Devon, who had employed the carpenter:
>
>> 'In general, an action lies for the malicious publication of statements which are false in fact, and injurious to the character of another (within the well-known limits as to verbal slander), and the law considers such publication as malicious, unless it is fairly made by a person in the discharge of some public or private duty, whether legal or moral, or in the conduct of his own affairs, in matters where his interest is concerned. In such cases, the occasion prevents the inference of malice, which the law draws from unauthorized communications, and affords a qualified defence depending upon the absence of actual malice. If *fairly* warranted by any reasonable occasion or exigency, and honestly made, such communications are protected for the common

convenience and welfare of society; and the law has not restricted the right to make them within any narrow limits.'

"The various types of qualified or conditional privilege are categorized in Prosser, *Torts* (3d Ed. 1964) at 805 ff. and in *Restatement, Torts* §§ 593-612 (1938). Communications arising out of the employer-employee relationship clearly enjoy a qualified privilege, and could be included in the line of cases which extend the privilege to groups engaged in a common purpose, Prosser, *Torts,* at 809; *Restatement, Torts,* § 596, or may more simply be regarded as sui generis, relying on *Toogood v. Spyring, supra.* Bower, *Actionable Defamation* (2d Ed. 1923) at 116, takes the latter view. See also, Evans, *Legal Immunity for Defamation,* 24 Minn. L. Rev. 607 (1940)." (250 Md. at 486, 243 A. 2d at 536)

In regard to the direction of the verdict for the defendant by the trial court, Judge Singley stated:

"We think that the trial court was correct in directing a verdict for the defendants, for as was said in *Fresh v. Cutter*:

'Without reviewing the decided cases, it may be said, that the weight of authority is to the effect that the mere fact of the communication being voluntarily made, does not necessarily exclude it as a non-privileged communication; for a publication warranted by an occasion apparently beneficial and honest, is not actionable in the absence of express malice (citing authorities). * * * It is a question for the Court whether the statement if made in good faith and without malice is thus privileged. But the plaintiff has the right notwithstanding the privileged character of the communication to go to the jury, if there be evidence tending to show actual malice, as when

the words unreasonably impute crime, or the occasion of their utterance is such as to indicate, by its unnecessary publicity or otherwise, a purpose wrongfully to defame the plaintiff (citing cases). Or, malice may be established by showing that the publication contained matter not relevant to the occasion (citing authority). Expressions in excess of what the occasion warrants do not *per se* take away the privilege, but such excess may be evidence of malice (citing cases).' 73 Md. at 93-94." (250 Md. at 489-90, 243 A. 2d at 538)

There was no evidence of actual malice in the plaintiff's testimony; indeed, the evidence was to the contrary. Inasmuch as the letter was privileged, the burden was on the plaintiff Peurifoy to prove express malice or bad faith and, as we have indicated, there was a complete failure of proof in this regard.

The appellant contended in his brief and in the argument before us that there was a "publication" of the alleged libel by dictation of the letter of January 21 by Mr. Whalen to his secretary, relying upon the decision of the Court in *Gambrill v. Schooley,* 93 Md. 48, 48 A. 730 (1901). Our predecessors, however, limited the decision in the *Gambrill* case to cases in which there was *no privilege,* as exists in the present case. Chief Judge Marbury, for the Court, stated in *Domchick v. Greenbelt Consumer Services, Inc.,* 200 Md. 36, 87 A. 2d 831 (1952) :

"He [the appellant] further contends that the dictation of the memorandum and letters to the stenographer took the case out of the privileged class. In support of this contention, he cites the case of *Gambrill v. Schooley,* 93 Md. 48, 48 A. 730, 52 L.R.A. 87, which held that the dictation of a letter to a stenographer was publication, that there was no privilege between the stenographer and her employer, and that such a dictation in that case took the communication

out of the privileged class. In that case, however, the defendant dictated a libellous letter to his stenographer and had it mailed to the plaintiff, and the sole question was whether, under such circumstances, the dictation to the stenographer was a publication of the letter, as, of course, the defendant could not have been liable for a letter written to the plaintiff had not someone else seen it. This court held in that case, that, as the stenographer had no interest in the matter, it was a publication. There was no question of privilege in that case at all, and we would be loath to hold that privileged communications respecting the affairs of a corporation or a business must be written by hand and not dictated, as is the universal custom. Ashelman was using the ordinary facilities of his office, in doing something which came within the duties of his office, and to hold that dictating letters and memoranda about such matters to his stenographer was a publication of them to a person who had no interest in them, and, therefore, they were without the ordinary privilege they would otherwise have had, leads to a conclusion which can only be termed ridiculous." (200 Md. at 43-44, 87 A. 2d at 835)

In this case, we are of the opinion that there was no publication of the letter of January 21 by the dictation of the letter by Mr. Whalen to his stenographer and by her transcription of the letter. The trial court properly directed the verdict for the defendant in regard to Count I.

### (2)

Count II sought recovery for the breach of the oral contract of employment by Congressional Motors.

Much of the argument in the briefs of the respective parties revolves around what were the terms of the alleged oral contract, whether they were too vague and uncertain to be enforceable legally, whether the oral agree-

ment violated the provisions of the Statute of Frauds and, if so, whether the Employment Verification Request, heretofore mentioned, was sufficient as a memorandum, signed by the party to be charged, to satisfy the requirements of the Statute of Frauds in regard to a memorandum.

We do not deem it necessary to pass upon these interesting questions inasmuch as we are of the opinion that whatever the terms of the oral contract were and even if it could be enforced notwithstanding the provisions of the Statute of Frauds, the contract of employment was clearly subject to the constructive concurrent condition that the employee Peurifoy would render service as comptroller and general manager in a reasonably satisfactory manner and in accordance with generally accepted standards for that employment. See *Foster-Porter Enterprises, Inc. v. De Mare,* 198 Md. 20, 34, 81 A. 2d 325, 332 (1951). See also 3A Corbin, *Contracts,* § 675, *et seq.* (1960). The evidence of the employee himself, as well as the evidence of Mr. Belloff, the certified public accountant, produced on behalf of the employee, indicates that the employee failed in several regards to comply with the constructive condition. Mr. Peurifoy admitted in cross-examination to many of the matters set forth in the letter of January 21 and Mr. Belloff testified that the improvement in the books "was not as much as it probably should have been" and further that the employee's procedure for handling the cash drawer overages and the bad check payments were not in accord with usually accepted accounting practices. Under these circumstances it is clear from the testimony produced by the plaintiff that he had breached the constructive condition applicable to him and could not recover compensation for his services after he had, himself, breached the constructive condition. There was nothing to submit to the jury on Count II. The trial court, therefore, properly directed the verdict for the defendant employer on Count II, although it principally relied upon the provisions of the Statute of Frauds in reaching its conclusion in regard to that Count.

## (3)

Count III sought damages for alleged fraudulent inducement of employment of Mr. Peurifoy by Congressional Motors. The appellant's contentions in regard to this Count may be quickly answered.

In the first place, there was no representation by Mr. Whalen that Mr. Peurifoy would in fact receive $15,000 for the balance of 1966 and $20,000 for the year 1967. Mr. Peurifoy's account, on cross-examination, of what was said when the oral contract of employment was made, negatives this. After telling Mr. Whalen what he then earned at McKay Chevrolet, Mr. Peurifoy testified:

"Q. He offered you then $230.00 a week? A. That's right, sir.

"Q. What did you say to that? A. I told him, asked him if he could make it two and a half.

"Q. What did he say? A. He said okay."

After discussions in regard to an automobile, its gas, oil and maintenance, Mr. Peurifoy stated that Mr. Whalen told him in regard to the $15,000 for the year 1966, that he "would possibly do better." He then stated:

"Q. Did he ever say to you, Mr. Peurifoy, 'I guarantee you $15,000.00 in the balance of the year 1966 and I guarantee you $20,000 for the year 1967?' A. No, sir. He did not say this.

"Q. But the extent of it was that he told you —quote—you would possibly do better? A. That's right."

It is apparent that Congressional Motors did not make any representation—fraudulent or otherwise—that Mr. Peurifoy would, in fact, receive $15,000 for the balance of 1966 or $20,000 for 1967.

Nor was there any evidence that Mr. Whalen knew that any statements of his were false or that he, on behalf of the company, did not expect to carry out any statements made by him.

Not only must proof of actual fraud be clear and convincing and such as will appeal strongly to the conscience of the Court—see *Bachrach v. Washington United Cooperative, Inc.,* 181 Md. 315, 321, 29 A. 2d 822, 825 (1943), but a misrepresentation believed by the speaker to be true and not made with a reckless disregard of whether it is true or false, even though induced by negligence or ignorance, will not sustain an action for fraud. *Lambert v. Smith,* 235 Md. 284, 288, 201 A. 2d 491, 493-94 (1964). In the present case there was no false representation proved and there is no evidence that, in any event, there was knowledge by the defendant of any falsity in any statement. The trial court, in our opinion, properly directed the verdict on Count III for the defendant.

*Judgment affirmed, the appellant to pay the costs.*