617 A.2d 1098

**John M. KROUSE**

v.

**Allen J. KROUSE, III.**

**No. 297, Sept. Term, 1992.**

Court of Special Appeals of Maryland.

Jan. 5, 1993.

Walter W. Pitsenberger, Bowie, for appellant.

Richard L. Lyon (Dragga, Lyon & Sundt, on the brief), Rockville, for appellee.

Argued before ALPERT, FISCHER and HARRELL, JJ.

ALPERT, Judge.

Allen J. Krouse, III, appellee, successfully challenged testator's purported Last Will and Testament as having

been procured by fraud and/or undue influence. John M. Krouse, appellant, a primary beneficiary under the purported will, subsequently appealed to this court and correspondingly asks us to address the following five questions:

I.    Did the trial court err when it refused to give an instruction that clear and convincing proof was necessary to establish the fraud alleged?

II.   Did the trial court err when it failed to direct judgment for the defendant/caveatee John at the close of the evidence in the case?

III.  Did the trial court err in the instructions given, including preponderance of the evidence and insane delusion?

IV.   Did the trial court err when it permitted testimony, over objection, of "Prior Consistent Statements"?

V.    Did the trial court err when its bias toward John and his wife were exhibited in the presence of the jury?

We answer each of the questions in the negative, and therefore affirm the trial court.

### Background

This case concerns a will that was successfully contested. And, as perhaps with most will cases, the major players are all related to one another. We therefore begin by identifying the members of the family who are relevant to the case *sub judice*.

During his lifetime the decedent and patriarch, Allen J. Krouse, Sr. ("Senior"), fathered two sons through his wife, the late Anna Krouse ("Anna"): son #1, the late Allen J. Krouse, Jr. ("Junior"), and son #2, appellant/caveatee John M. Krouse ("John"). Junior, upon his passing, was—in turn—survived by three adult children, including appellee/caveator Allen J. Krouse III ("Allen III") and Allen III's sister, Christine Krouse Schwartz ("Christine"). John and his wife, Lorraine Krouse ("Lorraine"), have five adult children as a result of their marriage. As indicated, the

primary parties to this litigation are John (*i.e.*, Senior's son # 2) and Allen III (*i.e.*, Senior's grandson through son # 1).

The facts leading up to this litigation may be summarized as follows:

Senior was born on May 20, 1904. With the exception of a brief period of time in the late 1940's when he was in private practice, Senior, an attorney, spent his entire career as a prosecutor with the United States Department of Justice. He eventually retired sometime during the 1960's to a monthly retirement income of approximately $2,000.

Senior and Anna, his wife, lived together for many years at their marital home in Bethesda, Maryland. When Anna died in October, 1982, Senior continued to live at the residence until his own death on or about November 13, 1989. This litigation concerns events that occurred during that period of time when Senior lived alone at the former marital residence, *i.e.*, between October, 1982, and November 13, 1989.

The record reflects that beginning sometime in late 1983 or early 1984, and continuing up through late 1986, Junior assisted his father (Senior) in the management of Senior's checking account. Specifically, Junior would "help" Senior pay his (Senior's) bills by typing out the checks and then presenting them to Senior for his signature.

In September, 1986, several of these checks bounced, and, as a result, Senior sought to review his checking account ledger. At some point Lorraine (John's wife and Junior's sister-in-law) began assisting Senior in examining the check-bouncing situation and, in the process, she determined two interesting things: (1) the cause of the bounced checks was a record-keeping error, *i.e.*, one of Senior's retirement income deposits had been mistakenly credited twice, and (2) the checking account ledger during the period of Junior's assistance revealed that more than $19,900 worth of typed-checks had been made payable directly to Junior. There was no evidence that the overdrafts were caused by, or were in any way related to, the checks that had been made payable to Junior; nor was there any direct evidence pre-

sented that indicated that Junior had procured the $19,900 through illegal, fraudulent or otherwise unseemly ways.

That notwithstanding, the record reflects that Senior, after he was presented with these two pieces of interesting information, became convinced that Junior, his son, had been stealing from him. There are conflicting allegations, however, as to whether (or to what degree) Lorraine and John actively encouraged Senior to believe that Junior was a thief. Nevertheless, the record reflects that Lorraine herself believed (and indeed still believes to this day) that Junior was stealing from Senior, and the record further reflects that Lorraine indicated this belief to several individuals, including two of Junior's children, namely, Allen III (appellee herein) and his sister, Christine. Additionally, the record further reflects that after the bounced-checks situation came to light, Lorraine and John themselves began spending a great deal of time "assisting" Senior.

For example, on November 10, 1986, (according to John's own testimony) Lorraine and John "assisted" Senior by taking him to State National Bank and Perpetual American Bank to remove Junior's name from several of Senior's bank accounts. The record also reflects that, on that date, Senior executed Powers of Attorney in favor of John. In mid-November, 1986, Lorraine "assisted" Senior by typing for him a Last Will and Testament, and then further "assisted" Senior by driving him to the home of Vincent and Holly Hecker (together, the "Heckers") where this purported will was executed and attested.

On or about January 7, 1987, Junior died unexpectedly. The record reflects that, during Junior's wake, Lorraine and John indicated to Allen III that they (Lorraine and John) intended to have Senior make a new will. Subsequently, (the record reflects,) Lorraine and John reiterated a similar intention to Allen III's sister, Christine.

In accordance with these stated intentions, the record reflects that on or about March 22, 1987, at Senior's own home, Lorraine typed for Senior another purported Last Will and Testament. It was apparently later that day,

March 22, 1987, that John and Lorraine again drove Senior to the Heckers' home, where this document was signed and executed. The record reflects that Junior was not told about the existence and/or execution of the November, 1986 will, nor were his immediate family ever told about either the November, 1986 or the March 22, 1987 purported wills.

On or about November 13, 1989, Senior died. Shortly thereafter, the Orphans' Court for Montgomery County (hereinafter, the "Orphans' Court") (1) appointed John as the Personal Representative of Senior's estate, and (2) admitted to administrative probate the March 22, 1987 purported will. Thereafter, Allen III timely filed a "Petition to Caveat Will." Pursuant thereto, and by Consent Order dated October 23, 1990, the Orphans' Court transmitted six "issues" to the Circuit Court for Montgomery County (hereinafter, the "Circuit Court") [1].

On November 5, 1991, a jury trial (Honorable J. James McKenna, presiding) on the caveat commenced. The record reflects that, at the close of all the evidence, the trial court, *inter alia,* instructed the jury as follows:

I will tell you that in this instance as to each of these issues, the burden is on the Plaintiff [Allen III], and the burden must—the burden is that of what we call a preponderance of the evidence. * * *

To prove a preponderance of the evidence means to prove that something is more likely so than not so. * * *

A will is not valid if, at the time of its execution, the maker of the will suffered from an insane delusion. And that insane delusion entered into and substantially effected his judgment concerning the contents of the will and/or his mental processes in making the will. * * *

---

**1.** Of these six "issues," only five were eventually submitted to the jury. The sixth issue, whether "the paper writing dated the 22nd day of March, 1987, purporting to be the Last Will and Testament of Allen J. Krouse, [was] signed by Allen J. Krouse and attested and subscribed in his presence by two or more credible witnesses," was decided by trial court in favor of John, and against Allen III, and thus was *not* submitted to the jury.

Let me discuss now undue influence, which is one of the things that you will have on here. A will is not valid if it was the result of or was obtained by the use of undue influence imposed on the maker of the will.

Undue influence means that domination and influence ... were exercised by another person on the maker of the will to such an extent that the maker's free choice was destroyed, and he was prevented from exercising his own free judgment and choice.  * * *

Now, let me talk about fraud. A will is not valid if it was the result of or was obtained by the use of fraud practiced on the maker of the will. Fraud means that the maker of the will did not know he was signing a will or was misled or deceived as to the provisions of the will.

That is[,] a false representation was made to the maker of the will by another person who knew the representation was false, and who made the representation with the intent of deceiving the maker of the will.

At the time the will was executed, the false representation in fact deceived the maker of the will and effected his judgment for choice.  * * *

Fraud will often occur when one of the beneficiaries under a will makes a false statement to the testator to induce the execution of the will in a certain manner.

Fraud may take the form of false accusations which alienate the testator from the natural objects of his bounty.

After the jury had been excused from the courtroom, defendant/appellant John renewed a motion for judgment in his favor, which the court—in no uncertain terms—denied.

Subsequently, the jury returned its verdict in the form of Answers To Issues. The jury specifically found as follows:

Question 1: Were the contents of the said paper writing, dated the 22nd day of March, 1987, purporting to be the Last Will and Testament of Allen J. Krouse, read to or by him or known to him at or before the time of the alleged execution of said paper writing?  ...  Yes.  * * *

(Therefore the jury resolved Question 1 in favor of appellant John, and against appellee Allen III.)

Question 2: Was the said writing, ... dated March 22, 1987, and purporting to be the Last Will and Testament of Allen J. Krouse, executed by him when he was legally competent to make a will? ... Yes.

(Therefore the jury also resolved Question 2 in favor of appellant John, and against appellee Allen III.)

Question 3: Was the alleged execution of the paper writing, dated March 22, 1987, purporting to be the Last Will and Testament of Allen J. Krouse, procured by undue influence exercised and practiced upon by Allen J. Krouse? ... Yes.

(Therefore the jury resolved Question 3 in favor of appellee Allen III, and against appellant John.)

Question 4: Was the alleged execution of the paper writing, dated March 22, 1987, purporting to be the Last Will and Testament of Allen J. Krouse, procured by fraud exercised and practiced upon by Allen J. Krouse? ... Yes.

(Therefore the jury also resolved Question 4 in favor of appellee Allen III, and against appellant John.)

Question 5: Is the said paper writing, dated the 22nd day of March, 1987, the Last Will and Testament of Allen J. Krouse? ... No.

(Therefore the jury also resolved Question 5 in favor of appellee Allen III, and against appellant John.)

A timely appeal to this court followed, wherein John has asked us to resolve the five questions heretofore stated (which shall be addressed in turn).

### *Law*

I. Did the trial court err when it refused to give an instruction that clear and convincing proof was necessary to establish the fraud alleged?

■ With respect to this question, several issues are beyond dispute. First, the trial court instructed the jury

that, with respect to *each* of issues in the case (including the question as to fraud), the plaintiff's (*i.e.,* Allen III's) burden of proof was by a preponderance of the evidence. Second, the burden of proof in a *civil cause of action* based on fraud (as distinguished from a *will contest* based on fraud) is by clear and convincing evidence. *See, e.g., Weisman v. Connors,* 76 Md.App. 488, 502, 547 A.2d 636 (1988), *cert. denied,* 314 Md. 497, 551 A.2d 868 (1989). Third, John essentially contends that the burdens of proof in a civil action based on fraud, and in a will contest based on fraud, are the same, and therefore the trial court erred by giving the "preponderance" instruction. Fourth, in so contending, John has raised a pure issue of law. And finally, fifth, with respect to this issue, this case may *almost* be regarded as a case of first impression, in that there has been no clear statement of the law in over a hundred years.

Indeed, the last time a Maryland appellate court was asked to resolve an issue concerning the burden of proof in a will caveat based on fraud, the year was 1879, and the venerable case was *Griffith v. Diffenderffer,* 50 Md. 466 (1879). In *Griffith,* the plaintiffs/caveators, *inter alia,* prayed

4. [t]he [trial] Court to instruct the jury, that while fraud is not to be presumed as set forth in defendants' fifth prayer, yet the jury may infer it from all the facts and circumstances of the case, and that *no higher degree of proof is required to establish fraud than to establish other facts that require to be proved.* But the jury must be satisfied from all the facts and circumstances offered in evidence, that fraud was used to procure the will[.]

*Id.* at 475–76 (emphasis added). The trial court granted plaintiffs' prayer, and thus did so instruct the jury. Accordingly, the defendants/caveatees appealed alleging that the trial court's instruction was in error. In this regard, therefore, the *Griffith* case is analogous to the case *sub judice* in that there, as here, (1) the trial court instructed the jury as to a preponderance of the evidence standard in a will

caveat case, and (2) the caveatees alleged such an instruction to be in error.

In ruling on the issue, the Court of Appeals, in *Griffith*, used language that was both admittedly succinct and dispositive of the first issue in the case at bar: "The plaintiffs' fourth, fifth and sixth prayers announce well-settled principles, and there was no error in granting them." *Id.* at 489. As indicated above, the so-designated "fourth . . . prayer[ ]" concerned the jury instruction as to finding fraud by a preponderance of the evidence.

As the intervening one hundred thirteen-plus years have not seen this principle set forth in *Griffith* modified, nor overruled, it must today still be seen as valid: *in a will caveat,* no higher degree of proof is required to establish fraud than to establish other facts that require to be proved. In other words, in a will caveat, the caveator need only prove fraud by a preponderance of the evidence.

Indeed, rather than modifying this principle, the Court of Appeals has cited *favorably Griffith's* holding with respect to the burden of proof: "The burden of proof is the caveator's when fraud is alleged, *Sykes,* § 102 at 155, *Griffith v. Diffenderffer,* 50 Md. 466, 482 (1879), as it is when undue influence is charged." *See, e.g., Friedel v. Blechman,* 250 Md. 270, 285–86, 242 A.2d 103 (1968) (other citations omitted).

Our holding (vis-a-vis the preponderance standard in *will caveat* cases based on fraud) is further supported by the following historical analysis of the degree of proof in *standard civil fraud* cases. As indicated above, there is no question that the burden of proof in a *civil cause of action* based on fraud (as distinguished from a *will contest* based on fraud) is currently recognized as being by clear and convincing evidence. *See, e.g., Weisman, supra,* 76 Md. App. at 502, 547 A.2d 636. The historical lineage of this degree of proof may be traced back through, *e.g.,* the following line of cases: *First Nat'l Bank v. U.S.F. & G., Co.,* 275 Md. 400, 411, 340 A.2d 275 (1975) ("When fraud . . .

is imputed, something more than a mere preponderance of evidence must be produced; *the proof must be 'clear and satisfactory' and be of such a character as to appeal strongly to the conscience of the court"*); *Peurifoy v. Congressional Motors*, 254 Md. 501, 517, 255 A.2d 332 (1969) ("[P]roof of actual fraud [must] be *clear and convincing and such as will appeal strongly to the conscience of the Court* [.]"); *Bachrach v. United Cooperative*, 181 Md. 315, 320–21, 29 A.2d 822 (1943) ("Where a foreclosure sale has been finally ratified in accordance with established chancery practice, and the sale is impeached on the ground of fraud, the alleged acts of fraud must be *clearly established by proof and must be of such a character as to appeal strongly to the conscience of the court,* before the sale will be set aside"); *Rent–A–Car Co. v. Fire Ins. Co.*, 161 Md. 249, 268, 156 A. 847 (1931) ("When fraud or criminal conduct is imputed the decisions frequently declare that something more than a mere preponderance of evidence must be produced, and that *the proof must be clear and satisfactory"*); *Thompson v. Williams*, 100 Md. 195, 199, 60 A. 26 (1905) ("When a deed is assailed for fraud, [various circumstances must] furnish *strong and satisfactory evidence* of the existence of fraud[.]"); and, *Corner v. Pendleton*, 8 Md. 337, 347 (1849) ("[In a standard civil fraud case, d]epending upon circumstantial evidence, and involving moral delinquency, not to say criminal offense, . . . we think *the inference should be so strong as to exclude the presumption that [fraud did not occur].* " [2]).

In tracing the lineage of the "clear and convincing" standard in *standard civil fraud* cases, one thing therefore seems clear: the language chosen by the court to express the higher standard (than mere preponderance of the evi-

---

**2.** In this regard, the court in *Corner* cited *Jones v. Mechanics Bank*, 8 Gill. 123 (1849), "where the circumstances were very strong to show that Perry had improperly obtained the plaintiff's money and deposited that very money in the bank. But the court held that there was a failure of evidence on this point." *Corner,* 8 Md. at 347–48.

dence) has varied both over time and by jurisdiction. As has been noted,

> It has been variously stated, ... that in order to establish fraud [in a civil case] the evidence must be satisfactory, *or* clear and satisfactory, *or* clear and convincing, *or* clear, cogent, and convincing, *or* clear, satisfactory, and convincing, *or* strong and decisive, *or* strong, clear, positive, and convincing, *or* clear, precise, and indubitable, *or* conclusive, *or* clear and conclusive, *or* clear and positive, *or* explicit, clear, and conclusive, *or* so clear and convincing as to satisfy the jury or the court sitting without a jury, *or* clear and decisive, *or* clear, satisfactory, and persuasive, *or* clear, distinct, and certain, *or* clear, satisfactory, and conclusive, *or* clear, unequivocal, and convincing, *or* testimony of the strongest and most cogent character, *or* clear and satisfactory to an extent in proportion to the seriousness of the fraud charged. Again, it is said that fraud alleged in a civil case must clearly appear, *or* be clearly shown, *or* clearly proved, *or* clearly established, *or* clearly and fully established, *or* distinctly proved, *or* clearly and distinctly proved, *or* clearly, distinctly, and fully proved, *or* established by the most satisfactory evidence, *or* evidence so clear and strong as to produce satisfactory conviction and lead the mind of the court to the conclusion that a fraud has been perpetrated, *or* that a clear case should be made out and that a bare preponderance of evidence which at the same time is vague and ambiguous is not sufficient.

37 Am.Jur.2d *Fraud and Deceit* § 468 (1968) (quoting the "clear and convincing" standards used by various jurisdictions over the course of time; actual citations omitted). It is significant to note that the precursor of the "clear and convincing" standard in civil fraud cases (*i.e.*, proof by *more than a preponderance of the evidence*), as is reflected by the line of cases cited above, *pre-dates* the Court of Appeals' holding in *Griffith*. Consequently, it follows that the Court in *Griffith* was aware of the higher standard applicable to *civil fraud* cases, when it nonetheless con-

firmed that the standard for proving fraud in *will caveat* cases was by the comparably lower "preponderance of the evidence."

It is significant to note that appellant John has failed to cite *any* authority for his contention that the standard of proof in a *will caveat* should be by clear and convincing evidence. Instead, John simply (1) acknowledges the existence of *Griffith*, (2) acknowledges that Phillip Sykes, in his treatise *Contest of Wills in Maryland*, quotes the *Griffith* case favorably but "without other authority," and (3) baldly asserts that Maryland Civil Pattern Jury Instruction ("MCPJI") I:8b is "the standard instruction where fraud is alleged." Even by its terms, however, MCPJI I:8b is inapposite to the case at bar.

MCPJI I:8b is, by its terms, applicable *only* where "The [moving party] has asserted *the [civil] claim of fraud* in [the] case [at issue]." (Emphasis added.) In contrast, the jury instruction concerning alleged fraud in *will contest* case neither mentions, nor incorporates by reference, the civil fraud standard. *See* MCPJI 29:5. Indeed, the record reflects, and John does not dispute, that the trial court's instruction as to fraud *complied* with all of the requirements set forth in MCPJI 29:5.

Thus, we now affirm the lower court and simultaneously uphold the standard set forth in *Griffith*.

II.  Did the trial court err when it failed to direct judgment for the defendant/caveatee John at the close of the evidence in the case?

■ At the close of Allen III's case, and again at the close of the entire case (after the jury had been excused from the courtroom), John moved for judgment in his favor. John's motion was based on his contention that "there is no evidence, not just slight evidence, but no evidence" that supported Allen III's caveat.

The trial court's denial of this motion was quick and definitive: "You[, John,] are absolutely wrong. There is a

plethora of evidence on that score." The court then went on to present a summary, which comprised three and one-half pages of typed trial transcript, of the evidence supported Allen III's caveat. Notwithstanding the court's recitation of the substantial evidence supported Allen III's caveat, John now argues that the court's denial of his motion for judgment was in error. We disagree.

Pursuant to Md. Rule 2–519(b), "When a motion for judgment is made [at the close of all the evidence, as here], the court shall consider all evidence and inferences in the light most favorable to the party against whom the motion is made."

If, after being viewed in the light most favorable to the party against whom the motion is made, the evidence is insufficient to go to the jury, then—and only then—may the trial court grant the movant's motion.

In *Keene v. Arlan's Dep't Store*, 35 Md.App. 250, 370 A.2d 124 (1977), we summarized the law concerning "sufficiency":

[W]e will, in testing the sufficiency of the evidence, resolve all evidentiary conflicts in favor of the plaintiff and assume the truth of all the evidence and inferences that may naturally and legitimately be adduced therefrom in favor of the plaintiff's right to recover. We have also said that a plaintiff has not met his burden of proof if he presents merely a scintilla of evidence where the jury must resort to surmise and conjecture to declare his right to recover.

*Id.* at 253–54, 370 A.2d 124 (*quoting Baulsir v. Sugar*, 266 Md. 390, 394–95, 293 A.2d 253 (1972)) (citations omitted); and

"Maryland has gone almost as far as any jurisdiction that we know of in holding that meager evidence ... is sufficient to carry the case to the jury"; that the rule requires submission of the case to the jury if there be any evidence, however slight, legally sufficient as tending to

prove [the cause of action], the weight and value of such evidence being left to the jury[.]   * * *

*Id.* 35 Md.App. at 254, 370 A.2d 124 (*quoting Mass Transit Administration v. Miller,* 271 Md. 256, 315 A.2d 772 (1974)).

In the case at bar, and as discussed above, the trial judge summarized (in three and one-half pages of typed trial transcript) the substantial evidence which tended to support Allen III's caveat.   We need not recount that evidence here. We need only hold that the evidence as summarized was clearly sufficient to support the trial court's denial of John's motion for judgment.

III.   Did the trial court err in the instructions given, including preponderance of the evidence and insane delusion?

As indicated above, the procedural history of this case included the Orphans' Court submitting to the Circuit Court six "issues."   Of these six issues, five were submitted to the jury; the sixth issue—which concerned whether the will was properly attested—was decided by the trial judge himself in favor of appellant John, and against appellee Allen III.

Also as indicated above, the jury returned a verdict on the first two issues (whether Senior knew the contents of the purported will, and whether Senior was competent to execute it) in favor of appellant John; the jury, however, also returned a verdict on the remaining three issues (undue influence, fraud, and whether the document was Senior's Last Will and Testament) in favor of appellee Allen III.

■ John now argues that the trial court erred "in the instructions given, including preponderance of the evidence and insane delusion."   Indeed, it appears that John is alleging that the trial court made a number of different errors that, in their totality, command reversal.   We disagree;

specifically, we hold that, with respect to each instance of alleged error, the trial court acted properly.

We begin by noting that John's present "contention" is complicated, ambiguous, and to the small degree that it appears comprehendible, it is also absolutely non-sensical. John begins by claiming that the trial judge erred by submitting the second issue on the verdict sheet to the jury. This second issue, as was discussed above, (1) concerned whether—on March 22, 1987—Senior was legally competent to make a will, and (2) was decided by the jury *in favor of John,* and against Allen III.[3] In other words, John *won* the issue and now claims it was error for it to be submitted to the jury.

The reason it was error for the trial court to submit this issue to the jury, John argues, was because it (*i.e.,* the second issue), "coupled with the *instructions given,* resulted in the determination that the Will was not valid." (Emphasis added.)

By using the vague phrase "the instructions given," it seems apparent that John is referring to three instructions in particular. First, John objected to the aforementioned instructions given as to the standard required for proving fraud.[4] Second, John apparently also objected to the trial court submitting the issue of undue influence to the jury.[5]

---

3. *I.e.,* Senior was found to be legally competent to make a will.

4. In his first issue on appeal, John contends that the trial court erred by instructing the jury that they could find fraud if such was proved by a preponderance of the evidence (rather than, as John contends, clear and convincing evidence).

5. With respect to this third issue on appeal, John quite correctly notes that "In order to submit the issue of undue influence to the jury, the burden was on the caveator, by a preponderance of the evidence, to establish this allegation." Notwithstanding the fact that the trial judge correctly instructed the jury as to this burden of proof, and notwithstanding the fact (as indicated in our discussion as to John's second issue on appeal) that there was sufficient evidence to permit the jury to decide any issue as to undue influence, John somehow contends—without further elaboration—that the instructions as to undue influence were inadequate or confusing.

Third, John objected to the instruction on insane delusion.[6]

John now contends that the totality of these instructions, combined with the fact that the trial court permitted the jury to consider the issue of competency, somehow confused the jury into finding in favor of Allen III. We disagree.

We begin by holding, as we did with respect to issue two on appeal, above, that there was sufficient evidence of record to permit the jury to consider issues as to fraud, undue influence and insane delusion. We also note, as we did above, that the trial court correctly instructed the jury as to the preponderance of the evidence standard for proving fraud in will caveat cases. Additionally, we also hold that the trial court properly submitted to the jury the issue as to competency. In short, we hold that the trial court did not err by submitting any of these issues, either alone or in combination with each other, to the jury.

■ We also note that, where independent grounds are sufficient to sustain a jury verdict, we are bound to uphold that verdict. *See, e.g., American Laundry Machinery v. Horan*, 45 Md.App. 97, 412 A.2d 407 (1980) (where a finding of negligence was independently supportable, we need not consider issues as to strict liability). Here, even if we were to agree with John and strike down the jury's finding with respect to undue influence, the judgment appealed from (as it is supported by the proper finding of fraud) would be unaffected.

IV. Did the trial court err when it permitted testimony, over objection, of "Prior Consistent Statements"?

■ With respect to this issue, the relevant facts may be summarized briefly: Allen III successfully had his grandfa-

---

6. John's "argument" as to the impropriety of an insane delusion instruction consists of a three-paragraph chronological summary of various trial testimony, concluded by the following "summarizing" paragraph:

    The court gave an instruction on insane delusion. An objection was made and rejected. This should not have been given under the evidence in the trial.

ther's (Senior's) alleged Last Will and Testament set aside as having been procured by fraud and/or undue influence at the hands of Lorraine and/or John. The effect of the subject will would have been to divest Allen III's side of the family of any interest in Senior's estate in favor of John's side of the family. At trial, in an attempt to demonstrate that Lorraine felt ill-will toward Allen III's side of the family [7], Allen III testified that Lorraine herself—at Junior's wake—stated (to Allen III) that she believed that Junior was a thief. For her part, although at trial Lorraine denied the *timing* of the alleged statements (*i.e.*, she denied making them *at the wake*), *she admitted the truth of their underlying sentiment;* that is, Lorraine herself testified at trial that she believed—and indeed still believes to this day—that Junior was a thief.[8] In an attempt to corroborate his original testimony—*i.e.*, that Lorraine said what she said *at Junior's wake*—Allen III presented (over objection) two witnesses (his sister, Christine, and his uncle, Robert Costello ("Costello")) to testify as to the contents of certain conversations that were alleged to have occurred at Junior's wake and that perfectly corroborated Allen III's original testimony. Specifically, Christine and Costello sought to testify that at the wake Allen III told each of them, respectively, what Lorraine had said about Junior. In each case, John objected to the testimony on the specific grounds that each party's testimony constituted impermissible hearsay. In each case, John's objections were overruled. John now contends that both Christine's and Costello's testimony ran afoul of Md.Cts. and Jud.Proc.Code Ann. ("CJ") § 9–117, in that, pursuant to the statute, neither Christine nor Costello were competent to so testify.

CJ § 9–117, in its totality, reads as follows:

---

**7.** Presumably, Lorraine's ill-will toward Allen III's side of the family, *inter alia,* supports the contention that she had motive to exert undue influence and/or fraud on Senior.

**8.** At trial, Lorraine also admitted that she related these sentiments (vis-a-vis her belief that Junior was a thief) to others.

It is not competent, in any case, for any party to the cause who has been examined therein as a witness, to corroborate his testimony when impeached by proof of his own declaration or statement made to third persons out of the presence and hearing of the adverse party.

The statute acts to suspend—under certain delineated circumstances—the common law "prior consistent statements" exception to the general hearsay preclusion.[9] Specifically, the statute, *inter alia*, renders the prior consistent statements exception unavailable to a party/witness who— having been impeached, seeks to corroborate his original testimony by presenting a third person to testify as to earlier consistent statements to the same effect made by the party to the third person. Consequently, the statute may be viewed as an "exception to an exception."

In contrast, however, John's stated objection to the challenged testimony was *not* based on CJ § 9–117. Rather, John objected to both Christine's and Costello's testimony on the single, stated grounds that such testimony was inadmissible hearsay.

As noted in *Brecker v. State*, 304 Md. 36, 497 A.2d 479 (1985), under "well-settled" Maryland law,

when an objector sets forth the specific grounds for his objection, although not requested by the court to do so, the objector will be bound by those grounds and will ordinarily be deemed to have waived other grounds not specified.

*Id.* at 39–40, 497 A.2d 479 (citations omitted).

In terms of ultimate admissibility, hearsay statements (John's stated grounds for objection), on the one hand, and

---

**9.** Generally, out-of-court statements made by a witness, which are similar to the witness' in-court testimony, are not admissible into evidence. But, where the credibility of a witness has been impeached in such a way as to indicate that his present testimony may be a fabrication, prior consistent statements are admissible for rehabilitative purposes if they would tend to show that such consistency was present prior to the time of probable fabrication. *Finke v. State*, 56 Md.App. 450, 492, 468 A.2d 353 (1983) (citations omitted). *See also Collins v. State*, 318 Md. 269, 285–86, 568 A.2d 1 (1990).

statements ruled inadmissible pursuant to CJ § 9–117 (on which John relies for the purposes of this appeal), on the other hand, are equally inadmissible.   That similar result notwithstanding, however, the two grounds are completely distinguishable;   indeed, ignoring temporarily the effect of CJ § 9–117, the testimony that Allen III sought to present was his own prior consistant statement (which he had made to a third person), and therefore such testimony was *not* objectionable as "standard" hearsay.   In other words, if the testimony at issue was objectionable at all, it was objectionable *only because* it ran afoul of CJ § 9–117, and *not* because it was ordinary hearsay.

We therefore hold that, in objecting on the ground of hearsay, John has failed to preserve the right to argue here that either Christine's or Costello's testimony was objectionable as violative of CJ § 9–117.

■ Moreover, even assuming *arguendo* that John *had* adequately preserved his right to object based on the statute, any error based on the trial court's ruling is harmless.

As indicated above, the ultimate significance of the subject testimony was in its content, to wit:  that Lorraine felt ill-will toward Allen III's side of the family.   Inasmuch as Lorraine herself expressly admitted, in open court and without objection, the validity of the *substance* of the subject testimony (although she denied having made the subject statements at issue), no prejudice can be said to have occurred, and thus any error related thereto is harmless. *See Robeson v. State,* 285 Md. 498, 507, 403 A.2d 1221 (1979) *cert. denied,* 444 U.S. 1021, 100 S.Ct. 680, 62 L.Ed.2d 654 (1980) (where a witness later gives testimony, without objection, which is to the same effect as earlier testimony to which can objection was overruled," *held* any error related thereto was harmless).

V.  Did the trial court err when its bias toward John and his wife were exhibited in the presence of the jury?

■ John contends that in five delineated instances the trial court, in the presence of the jury, unfairly demonstrat-

ed "bias toward" John. After reviewing the arguments set forth in that brief, we believe that John's counsel probably means to complain that the trial court unfairly exhibited *prejudice against* John [10]. That notwithstanding, after examining the record on appeal, we believe that the trial court acted properly in all cited instances, and therefore we must uphold its ruling. We shall, nevertheless, discuss the propriety of each cited instance respectively.

John errantly cites the following five instances as indicative of the trial court's prejudice:

1. Allen III, as plaintiff at the trial level, called defendant (and appellant herein) John as the second witness in his case-in-chief. Toward the end of the direct examination, Allen III's counsel asked John whether "[i]t bothered [him] ... that [his] father believed that [Junior] was stealing from [his father]?" John's answer at trial ("No[, it didn't bother me]") differed from his answer at deposition ("Yes, [it did]"). As a result, Allen III's counsel attempted to impeach John using the deposition testimony. John responded by flashing indignancy, which the trial court responded to quickly and appropriately pursuant to the following exchange:

Q: Do you recall your deposition of November 5, 1990?

A: No, I don't recall it. What did I say?

Q: Let me ask you this.

A: Why don't you just ask me the deposition—

THE COURT: Sir— ... you just stop. * * * Just stop right now. Don't you volunteer anything further. You answer the questions as they are asked. * * * Now, stop that business.

2. Allen III called John's wife, Lorraine, as the third witness in the plaintiff's case-in-chief. At one point, Allen

---

**10.** "Bias" has been defined as "a predisposition to decide a cause or an issue in a certain way." *Black's Law Dictionary* 147 (5th Ed.1979). Therefore, by contending that the trial court unfairly exhibited a bias *toward* John, counsel is suggesting that the trial court unfairly *favored* him.

III's counsel asked her a question which, in form, required a simple yes/no response. She responded by beginning an anecdotal answer, which the trial court quite properly cut short: "The question is whether or not you believed it. Either yes or no."

3. Allen III himself testified as the fifth witness in his case-in-chief. John's counsel began cross examination by requesting the court to designate Allen III as a "hostile witness." The court found no merit in the request, and accordingly and properly explained to counsel exactly what a hostile witness is:

> THE COURT: Hostile? Hostile means that he is going to get up and say that he is going to go over and slug you in the mouth. Now, I haven't seen that happen. That is what hostile witnesses are. He is already an adverse witness, you can cross.
>
> MR. PITSENBERGER [John's defense counsel]: I want the record to reflect—
>
> THE COURT: Let me say this, I am not going to do that, because a hostile witness is a person who declares hostility towards the lawyer. Now, if he gets up out of his chair and starts to menace you physically, I will then declare him as a hostile witness. Otherwise, I am not going to do that.
>
> MR. PITSENBERGER: May I have him declared an adverse witness, Your Honor?
>
> THE COURT: He is by definition, and you can cross examine him. You may proceed.

4. John claims that

> After permitting the plaintiff [Allen III] as much time as plaintiff desired to put on his case, the Judge *tried to crowd* the defense by *insisting* that he wanted to know how many witnesses were going to be called and how long the matter was going to take and that no cumulative testimony would be allowed.

(Emphasis added.) After reviewing the testimony in question, we believe that John has errantly mischaracterized a

reasonable (and, we believe, a permissible) request for information by the trial court. Indeed, there is *absolutely no* indication that the trial court "tried to crowd" defendant or "insist" on anything. The complained of exchange occurred essentially at the end of plaintiff's case-in-chief, and consisted of the following [11]:

> THE COURT: All right. Defendant, the spotlight shifts over to you then. Can you give us some idea of approximately the number of witnesses, and about how long you anticipate they are going to take?
>
> MR. PITSENBERGER: There are approximately 14 witnesses under subpoena for the defense side.
>
> THE COURT: That I know, but what I want to know is how many people are going to be called, who are not going to be excessively cumulative.
>
> Of course, I may allow some latitude, but not very much on this question of people saying the same thing over and over again.
>
> MR. PITSENBERGER: At this point I believe there will be six who will be called, maybe seven, who will not be cumulative.
>
> THE COURT: All right. * * * * Our presumption is that you are going to be bringing out some matters that have ... not been touched upon so far?
>
> MR. PITSENBERGER: Yes, sir.
>
> THE COURT: All right.

---

11. The complained of exchange actually occurred at the end of a morning session, immediately after Plaintiff's [Allen III's] counsel had indicated to the court that he did not plan to produce any more witnesses, but that he wanted to "just check a few exhibits and so forth" before formally resting. Before ending the morning session, the trial court then turned and addressed Defendant's [John's] counsel, and that's when the complained of exchange occurred.

   As part of Allen III's case-in-chief, Allen III had called both John (the defendant below) and John's wife, Lorraine, both of whom were also scheduled to testify as part of the defense. Thus, the danger of cumulative and duplicative testimony was a real one, and, we believe, warranted the reasonable concern of the trial court.

5. As more fully discussed above, *after the jury had been excused from the courtroom,* defendant/appellant John renewed a motion for judgment in his favor, which the court—in no uncertain terms—properly denied. John now contends that somehow the denial of this motion reflects the trial court's prejudice against John. We disagree.

Whatever the court said in denying John's motion, it was *not said in front of the jury.* Therefore there is no logical way that John can contend that the language used in denying this motion somehow prejudiced the jury against him. Thus John's reasoning, such as it is, is reduced to the following weak argument by analogy: the language used by the court in denying John's motion for judgment apparently reflected an unfair prejudice against John and that somehow, someway, it is therefore possible that the court was likewise prejudiced against John when the jury was present in the courtroom. Such an argument, we believe, is meritless.

There is, of course, no *necessary* link between the manner in which a judge treats counsel *in camera* and the manner in which the judge conducts a trial in front of the jury. That notwithstanding, and with respect to John's motion for judgment, we find no indication whatsoever that the trial judge failed to act impartially. The denial of the motion, as discussed above, was proper. The fact that it took the judge three and one-half pages to summarize the evidence in support of the denial, we believe, merely reflects the impropriety of John's motion, rather than reflecting any trial court prejudice against John. Indeed, John's basic complaint here is that the trial court failed to grant his motion which, of course, is not a grounds for reversal.

JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.