REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 929

September Term, 2013

---

ANDREW A. GREEN

v.

BETTY J. MCCLINTOCK

---

Wright,
Kehoe,
Arthur,

JJ.

---

Opinion by Arthur, J.

---

Filed: August 1, 2014

This case concerns a challenge to a last will and testament of the late Kenneth Green, as well as a contention that Maryland lacks jurisdiction to consider the challenge.

In 2003, the decedent executed a will in which he made his friend, Betty McClintock, the prime beneficiary. In 2009, when he was terminally ill, regularly taking opiates for pain, and completely dependent upon his brother, who had taken him from Maryland to Kentucky and held him there incommunicado, he executed a second will in which he revoked the earlier will and gave all of his assets to his brother.

McClintock challenged the second will, contending that it had been procured by fraud and undue influence. After a bench trial that extended over five days, the Circuit Court for Allegany County agreed. As a consequence of that decision, the earlier will, which favored McClintock, became the decedent's last will and testament. We shall affirm.

**FACTUAL AND PROCEDURAL HISTORY**

The multi-volume record in this case discloses few areas of agreement between the contending parties. Our obligation, however, is not to review and weigh the parties' respective contentions, but to recount the facts in the light most favorable to McClintock, the party who prevailed below. *L.W. Wolfe Enters., Inc. v. Maryland Nat'l Golf, L.P.*, 165 Md. App. 339, 343 (2005). Those facts are as follows:

A.      **The Parties**

1.      **The Testator, Kenneth Green**. The testator, Kenneth Green ("Kenneth"), was born on May 20, 1934, and died on January 19, 2010. Kenneth was

raised on a farm that was owned by his parents in Lonaconing, Maryland. His only sibling was his brother Albert Green ("Albert"). Kenneth never married and had no children.

Except for a few brief periods (when he was in the military, when he moved to Ohio for a job, and at the very end of his life), Kenneth spent the entirety of his life on or near the Green farm. For much of his life, he worked for Westvaco in Allegany County.

Before his father died, Kenneth lived on the farm with his parents, to whom he was devoted. After his father's death, Kenneth remained on the farm alone, raising cattle and hay. Aside from his mother, the farm and his cattle were the most important things in Kenneth's life.[1]

2.   **The Beneficiary, Albert Green**. Kenneth's brother Albert also worked for Westvaco for many years, but moved to West Virginia, near the border with Garrett County, in 1987. Kenneth's and Albert's mother, Ida, joined Albert in West Virginia after their father died. In 1998, a few years after his mother died, Albert retired and moved to Kentucky, where his sons lived.

3.   **The Personal Representative, Andrew Green**. Albert's son, Andrew Green ("Andrew"), is the personal representative under the will that has been challenged in this case. Andrew, who lives in Kentucky, had only limited contact with his

---

[1] The record indicates that farm was quite remote in that it was accessible only by a dirt road and never had landline telephone service.

uncle Kenneth for many years.

4.  **The Caveator, Betty McClintock**.  Betty McClintock was one of Kenneth's co-workers at Westvaco.  During the time when she and Kenneth worked for Westvaco, she spoke with him regularly, on almost a daily basis.  Kenneth admired her because she had raised four children on her own after her husband died in an automobile accident in the 1970s.

The circuit court found that, from the late 1980s onward, Kenneth and McClintock had a long-term, stable, caring, and supportive relationship.

B.  **Ida Green's Death and the Litigation Over Her Estate**

The roots of the present dispute can be traced back to May 1995, when Kenneth's and Albert's mother, Ida, died, without a will to direct who would inherit the Green farm or her other assets.  For several years, no one opened an estate on her behalf.  Instead, Kenneth continued to live on the farm and to raise cattle and engage in other farming activities there.

In about 2000 or 2001, Kenneth approached James Oberhaus, the president of Maryland Fuel Corporation, which owned the mineral rights under the Green farm.  Kenneth asked Oberhaus for assistance in obtaining sole title to the Green farm.  Oberhaus hired John Robb, a local attorney familiar with real estate matters, to assist Kenneth.  With Robb's assistance, Kenneth opened an estate for his mother in August 2002, more than seven years after her death.

The estate proceedings prompted a dispute between Kenneth and his brother Albert. Kenneth contended that the farm was his and that the $192,000.00 in assets in Ida's estate were to be divided equally between the brothers; Albert, on the other hand, contended that the farm and the other assets should be divided evenly between the two brothers. In October 2003, the orphans' court agreed with Albert that the farm should go to the brothers as tenants in common, and Kenneth appealed.

### C. Kenneth's First Will, in 2003

In the midst of the legal dispute between Kenneth and his brother, Oberhaus (of Maryland Fuel) suggested to Kenneth that he should have a will. Oberhaus was motivated, in part, by the prospect of obtaining title to the surface rights to the Green farm (*i.e.*, the right to strip-mine the farm), which he had previously attempted to obtain from Kenneth. Oberhaus referred Kenneth to Maryland Fuel's lawyer, Donald Nelson, for the purpose of drafting a will.

Oberhaus arranged Kenneth's first meeting with Nelson. The meeting took place in Oberhaus's office, and Oberhaus was present for the first 10 to 15 minutes of it.

Kenneth told Nelson that he wanted his entire estate to go to McClintock because she was a hard worker and had devoted a great deal of effort to raising her children after her husband's death. Neither Nelson nor Oberhaus knew McClintock at the time.

Kenneth specifically told Nelson that he did not want Albert or Albert's wife, Stella, to get any of his property. Consistent with that directive, the will makes no

4

provision for Albert or any member of Albert's family.

On Nelson's advice, Kenneth agreed to have the will include a provision that gave Maryland Fuel the option to purchase the Green farm from his estate after his death. The provision contained a mechanism to establish the purchase price. In addition, it directed that if Maryland Fuel exercised the option, the purchase price would go to McClintock.[2]

Kenneth executed the 2003 will at an M&T Bank branch office on March 5, 2003. According to Oberhaus's employee, Linda Malamis, who was a witness to the will, Kenneth told a bank employee at the time that he wanted to take care of McClintock. In addition, according to the bank employee, Kenneth stated that he disliked Albert's wife because she wanted all of his money and property and that he did not want Albert's wife to receive any of his assets.

### D. The Settlement of the Litigation Concerning Ida Green's Estate

In April 2004, a little over a year after he had executed his will, Kenneth traveled to Kentucky to take Albert's deposition in his appeal in the litigation concerning their mother's estate. Kenneth had never previously gone to Kentucky in his life.

Before any substantive questioning began in the deposition, Kenneth and Albert met privately and reached an agreement. Under the terms of the agreement, Kenneth

---

[2] Nelson was not then, and is not now, licensed to practice law in Maryland. In addition, Nelson represented Oberhaus and Maryland Fuel at the time he drafted Kenneth's 2003 will, but obtained no conflict waiver. Albert's son, Andrew, the personal representative under the will that has been challenged, makes an issue of these irregularities. The validity of the 2003 will, however, is not before us in this case.

5

would receive the Green farm, while Albert would receive all the money in their mother's estate, except for an advance that Kenneth already received.

While he was in Kentucky in connection with the deposition and the settlement discussions, Kenneth did not go to Albert's farm or meet with any of Albert's family members, including Albert's son, Andrew, the personal representative under the will that has been challenged in this case.

### E.     After the Settlement With Albert

After the settlement with Albert, the personal representatives of the estate conveyed the Green farm to Kenneth.  Kenneth later told his neighbor, Jeremy Kiddy, that he had had a hard time getting the farm.

Over the next several years, Kenneth continued to live alone on the farm and to work the farm.  He remained close to a small circle of friends and had no meaningful contact with Albert, Albert's wife Stella, or Albert's son Andrew.  Kenneth's friends included Kiddy, who helped him on the farm and saw him on almost a daily basis from 2004 until late July 2009, and McClintock, who accompanied Kenneth on errands and saw him on at least a weekly basis from March 2006 until late July 2009.

In addition to the farm, Kenneth owned a number of annuities, savings bonds, bank accounts, and brokerage accounts.  Beginning in 2004, Kenneth started making McClintock the beneficiary on his accounts.  In addition, he enlisted the aid of Oberhaus's employee, Linda Malamis, to make McClintock the payee on his savings

6

bonds upon his death.

**F.      Kenneth's First Serious Illness, in 2006, and Its Aftermath**

In May 2006, Kenneth was diagnosed with rectal cancer.  Several months earlier,

he had given McClintock a healthcare power of attorney.

After undergoing a colostomy in Morgantown, West Virginia, Kenneth stayed with

his niece (Albert's daughter) Amy Thompson.  While he was staying with the

Thompsons, however, Kenneth asked McClintock to take him to his chemotherapy

treatments.[3]

Kenneth became distrustful of Thompson's family, suspecting that someone had

gone through the personal papers that he kept in the trunk of his car.  He told Malamis

that he did not want his family to know his financial situation.  He requested that

McClintock keep all of his banking and investment records, which she did until

September 2009.

**G.      The Period from Late 2006 to Early 2009**

After several months with the Thompsons, Kenneth returned to the Green farm.

Thereafter, McClintock and Kenneth would meet at least weekly, and she would

accompany him on his errands.  On one of those excursions, Kenneth took McClintock to

the Green cemetery, showed her his parents' graves, and told her that he wanted to be

---

[3] The circuit court found that Albert's son, Andrew, did not visit Kenneth or send him any cards during this illness.  The court made no findings about whether Albert or his wife Stella visited Kenneth or corresponded with him at that time.

7

buried beside his parents.

During this same period, Kenneth instructed Malamis and the lawyer, Nelson, that he wanted McClintock to inherit all of his assets and that he wanted to leave nothing to his brother and his family. He expressed similar sentiments to his neighbor, Kiddy.

### H. The Onset of Kenneth's Second and Final Illness

In April 2009, McClintock took Kenneth to his regular physician, who told Kenneth that he was experiencing a relapse. In May 2009, McClintock took Kenneth to an oncologist, who diagnosed Kenneth with metastatic rectal cancer, which had spread to his lungs.

Around this time, Albert, his son Andrew, and other family members visited Kenneth on the Green farm for Kenneth's birthday (which was on May 20). After the guests left, Kenneth told Kiddy that he informed Albert and his family that they did not need to worry about the farm because they would not be inheriting it.

Shortly thereafter, Kenneth underwent surgery. During his recovery, Kenneth stayed with Adam Johnson, his great-nephew (and Albert's grandson). McClintock continued to see Kenneth once a week during this period.

### I. Kenneth's Admission to Sacred Heart Hospital

On July 31, 2009, McClintock went to visit Kenneth at the home of his great-nephew and saw that he appeared to be very ill. On that day, Kenneth was admitted to Sacred Heart Hospital in Cumberland.

8

Upon his admission, Kenneth's discharge plan was that he would return to the Johnson home upon his release. In fact, the Johnsons requested that home health services from the hospital be made available when Kenneth arrived at their home. While at the hospital, Kenneth was placed on a fentanyl patch and oxycodone. The hospital nurses noted some confusion on Kenneth's part and described Kenneth as giddy or happy. Kenneth remained on those opioid analgesics until his death several months later.[4]

McClintock visited Kenneth in the hospital every day until his discharge on August 13, 2009.

### J. Albert's Offer of Assistance

On August 3, 2009, a few days after Kenneth's admission to the hospital, Albert told the hospital staff that he was willing to take Kenneth to Kentucky and that he did not want Kenneth to live in a nursing home. Kenneth's medical records, however, contained no previous mention of a nursing home. Moreover, the reference to a nursing home conflicts with the prior discharge plan, under which Kenneth was to return to his great-nephew's home in Maryland.[5]

On August 6, 2009, a few days after Albert had offered to take Kenneth to

---

[4]The circuit court found that Kenneth was on morphine as well as fentanyl and oxycodone, but Andrew correctly points out that the record does not support that finding. The court's error is, however, immaterial in view of the other narcotics that Kenneth was indisputably taking.

[5] It is unclear whether Albert's conversation with the staff took place by telephone or whether Albert had traveled from Kentucky to Maryland as of the date of that conversation (August 3, 2009).

Kentucky, Albert met with Kenneth's oncologist and Kenneth. While he was in Maryland, Albert and his son Andrew also visited the Green farm.

### K.      The Limited Power of Attorney in Favor of McClintock

On August 7, 2009, Malamis brought Kenneth's advance directive to the hospital, and it was inserted into his medical records. Kenneth told the hospital staff that he did not want his family to know that he had a do-not-resuscitate order in effect.

While Malamis was at the hospital, Kenneth informed her that he wanted McClintock to perform some tasks for him, and they discussed giving her a power of attorney. Kenneth then spoke by telephone with his attorney, Nelson, who prepared a limited power of attorney in favor of McClintock. Nelson emailed the power of attorney to Malamis, and Malamis presented it to Kenneth, who executed it. The limited power of attorney instructed McClintock that Kenneth wanted his records to go to her home, that he wanted her to close his account at First Peoples Federal Credit Union and to deposit the proceeds into his M&T Bank account, and that she should cash some of his savings bonds to pay some of the medical bills that had accumulated.

After executing the power of attorney, Kenneth spoke to Oberhaus of Maryland Fuel and confirmed that the instrument appropriately documented his wishes.

Albert and his son Andrew were at the hospital on that date. Notably, as of that date, the discharge plan remained unchanged – Kenneth was to return to his great-nephew's house in Maryland.

**L.** **Kenneth's Announcement that He "Had to Go to Kentucky"**

On McClintock's regular, daily visit to the hospital on August 9, 2009,[6] Kenneth told her that he "had to go to Kentucky" with Albert. Otherwise, Kenneth said, he would have to go to a nursing home. Kenneth had never previously said anything to McClintock or to his acquaintances (Malamis, Nelson, or Kiddy) about going to Kentucky after his discharge.

McClintock offered to allow Kenneth to stay at her house and questioned why he would want to leave Maryland and stay with Stella, whom he disliked.[7] During the conversation, Kenneth became distraught and had a breakdown. McClintock did not pursue the issue further.

**M.** **Stella Green's Conversation with the Hospital Social Worker**

On August 11, 2009, the hospital "staff" informed a hospital social worker that Kenneth wanted to go to Kentucky. According to Kenneth's medical records, the social worker had talked to Albert's wife, Stella, who told her that "they want to bring him back to the farm where they live and where they grew up." The circuit court found that the reported statement was "blatantly and deliberately false," as Kenneth had gone to Kentucky only once in his life – for his brother's deposition in their litigation over their

---

[6] In its findings of fact, the circuit court stated that this conversation occurred on August 12, 2009, but the record reflects that it occurred on August 9.

[7] Over the years, Kenneth had told numerous people, including McClintock, Malamis, Nelson, and Kiddy, that he did not like or trust Stella and that his mother had not liked her either.

mother's estate.

In addition, according to the medical records, Stella reportedly warned the social worker to be careful of McClintock, saying that she was an old co-worker with the reputation of being a "black widow" and that she was using a power of attorney to keep Kenneth in Maryland.[8]

### N.  Kenneth's Conversation with Kiddy about Going to Kentucky

Like McClintock, Kenneth's neighbor, Kiddy, would also regularly visit Kenneth in the hospital.  Kiddy reported that Kenneth was concerned about his farm and his cattle.

Kiddy thought that Kenneth's discharge plan was for him to stay with Betty McClintock.[9]  On a visit on August 13, 2009, however, Kenneth told Kiddy that he was leaving for Kentucky with Albert.  When Kiddy questioned the reasons for this sudden change of plans, Kenneth said that he was staying there only for two weeks and would then return to the farm.  Albert confirmed that he would bring Kenneth back in two weeks.

### O.  McClintock's Last Conversation with Kenneth

On that same day, August 13, 2009, McClintock visited Kenneth again and

---

[8] In its findings of fact, the circuit court observed that Stella did not testify at the trial.  Nor did Albert.

[9] In its findings of fact, the circuit court incorrectly stated that, in Kiddy's understanding, the discharge plan was for Kenneth to return to the home of his great-nephew, Adam Johnson.  The error is immaterial: the essential point is that the discharge plan was for Kenneth to remain in Allegany County, and not to go to Kentucky.

12

reiterated that he could stay at her house. When McClintock had to leave for work, Kenneth asked if she would come back after work. She replied that she would.

McClintock never saw Kenneth again: later that day, Albert and his son Andrew removed Kenneth from the hospital and took him to Kentucky.

### P.     The First Kentucky Power of Attorney

The following day, August 14, 2009, Andrew downloaded a power of attorney from the internet. He called a friend and a notary to request that they come to Albert's home to witness the signing of a power of attorney by his uncle. Kenneth was seated in a hospital bed, with metal rails to prevent him from falling out, when Andrew read the document to him. Kenneth executed the power of attorney, which was in favor of Albert Green.

### Q.     Andrew and Albert Take Control of Kenneth's Accounts

A day or two later, Andrew and Albert returned to Maryland to obtain control of Kenneth's assets. They went first to the First Peoples credit union, where Albert presented the new power of attorney. There, they learned that Kenneth's account had been closed and the proceeds disbursed.[10]

Upon receiving that information, Andrew and Albert telephoned Kenneth and told

_____

[10] As stated above, Kenneth had previously given McClintock a power of attorney and instructed her to close the account and deposit the proceeds in Kenneth's M & T bank account. She carried out those instructions on August 14, 2009, the day after Albert and Andrew took Kenneth to Kentucky.

13

him that McClintock had closed the account and taken his money. Andrew and Albert then went to M & T Bank and obtained Kenneth's records, using the power of attorney.[11] In addition, they effected a change of address to Albert's home in Kentucky.

While they were in Maryland, Andrew and Albert retrieved some items from Kenneth's home. Either on this visit or an earlier visit when Kenneth was still in the hospital, Andrew and Albert obtained Kenneth's lock box and brought it back to Kentucky. Among other items, the box contained Kenneth's 2003 will.

A few days later, Albert, using the power of attorney, withdrew $10,162.55 from Kenneth's M & T bank account. During this same period, Albert and Andrew communicated with Robert Watson, a Maryland attorney, with regard to the Green farm.

### R.    The Powers of Attorney

On August 23, 2009, Andrew asked two friends and a notary to come to Albert's house to witness Kenneth's signing of several additional documents: a statement denying that Kenneth had executed the power of attorney in favor of McClintock; a document indicating his desire to transfer his farm to Albert; and a statement directing the attorney, Nelson, to cease activity on Kenneth's behalf. The signing was recorded on video at Andrew's insistence.

---

[11] Although Andrew testified that Kenneth drafted a letter to M & T Bank requesting that Betty McClintock's power of attorney and name be removed from the account and that the bank only wrote a check payable to Andrew after speaking with Kenneth, the circuit court chose not to credit that testimony.

Andrew read the series of documents to Kenneth, who was wearing a hospital gown and lying in a hospital bed in Albert's house. Albert was present as well, as was an unidentified woman whose voice is heard on the recording.

While he was signing the third document, Kenneth, who was smiling at the time, said: "We can handle it. It may not be right, but we can handle it. Rescind any power of attorney to Donald Nelson . . . . Where to sign . . . knows he needs to sign his name." When Kenneth had finished signing, Andrew said, "[T]hat will be good enough, I hope."

On that same day, August 23, 2009, Kenneth executed another power of attorney, this one in favor of Andrew. No one made a video recording of the execution of that power of attorney.[12]

S.    **Efforts to Cut Off Kenneth's Access to McClintock**

Meanwhile, on August 27, 2009, a palliative care visit occurred at Albert's house. The medical records from the visit reflect that someone – presumably a member of Albert's family – told the nurse that McClintock was one of Kenneth's former friends and that she should not be provided any information about Kenneth's health status.

On the following day, August 28, 2009, Dr. Ann Colbert visited Kenneth at Albert's house. During the visit, Stella told the doctor that "there had been a lot of trouble with a woman named Betty McClintac [sic] who had forged her signature on the

---

[12] The circuit court correctly observed that because of the two powers of attorney on August 14 and August 23, 2009, respectively, Andrew and Albert had entered into a fiduciary relationship with Kenneth.

[power of attorney]."  Stella also told the doctor that McClintock had wanted to place

Kenneth in a nursing home and had "taken quite a bit of his money."  She instructed the

doctor that McClintock was "not to be involved" in Kenneth's care and that she and

Albert had prevented McClintock from coming to visit or being involved.

### T.    The 2009 Will

By September 2, 2009, Leslie Richardson, a Kentucky attorney, had drafted a new

will for Kenneth.  The circuit court found no evidence, however, that Richardson actually

knew Kenneth or had ever met him.  Instead, Andrew had communicated with Richardson

about the will, and Albert and Stella had picked up the draft will from her office.

Kenneth was housebound and thus unable to pick up the will.[13]

On September 2, 2009, Andrew asked a few of his friends to come to his father's

home and witness the execution of the new will.  While Kenneth was in his hospital bed,

Andrew stood beside the bed and read the will.  Kenneth "agreed" with the will and

executed it, and it was witnessed and notarized.  No one made a video recording of the

execution of the will.

### U.    The Use of the Power of Attorney to Convey the Farm to Albert

On September 3, 2009, the day after the execution of the will, Andrew traveled to

Maryland to see Robert Watson, his Maryland attorney.  Using his power of attorney,

---

[13] Andrew asserted that Kenneth talked on the telephone with Richardson about what he wanted in his will, but the circuit court did not credit that testimony.

Andrew executed a deed by which he conveyed Kenneth's farm to Albert. The deed

recites that Kenneth is "incapacitated."[14]

### V. Additional Steps to Take Control of Kenneth's Assets

On September 16, 2009, Albert used his power of attorney to open a bank account

for himself and Kenneth at Citizens Bank in Kentucky. Despite the power of attorney,

Albert established the account as a joint account rather than as a fiduciary account.

Meanwhile, beginning in mid-August 2009, either Albert or Andrew had

communicated with Kenneth's investment managers and with others who held his assets.

By October 1, 2009, Albert and Andrew had succeeded in changing all beneficiary

designations on Kenneth's accounts from McClintock to Albert.[15]

Andrew or Albert sold Kenneth's cattle during this time period as well. There was

no evidence that the proceeds of the cattle sale were deposited into any of Kenneth's bank

accounts.[16]

Between October 1, 2009, and December 31, 2009, Albert withdrew $21,338.38

from Kenneth's account to pay for an addition to Albert's home. Also, on January 15,

---

[14] We are informed that the validity of that conveyance is currently the subject of other pending litigation in Allegany County.

[15] Andrew argues that Kenneth himself made the changes to the beneficiary designations, but the circuit court did not credit this testimony.

[16] Andrew asserts that the proceeds were deposited into the joint account at Citizens Bank in Kentucky, but admits that there was no testimony to support that assertion.

17

2010, four days before Kenneth's death, Albert paid Andrew $2,000 from Kenneth's account as "reimbursement for travel."

**W.      Additional Efforts to Hold Kenneth Incommunicado**

Beginning in mid-August 2009, Malamis and Kiddy repeatedly tried to communicate with Kenneth in Kentucky.  Kiddy was successful in talking briefly to him on one occasion, but Malamis was unable to reach him.  Both Kiddy and Malamis left numerous phone messages that were never returned.  Kiddy even traveled to Kentucky to find Kenneth, but was unable to locate Albert's farm.

In September 2009, Nelson, the attorney, spoke with Kenneth once as well. Kenneth wanted to make sure that "everything was okay" with his property and will, and Nelson reassured him that nothing was amiss based on the information that he had at the time.

Between August 13, 2009, when Albert and Andrew took him to Kentucky, and his death on January 19, 2010, Kenneth had no other contact with anyone in Maryland with whom he had previously been close.

Throughout that period, Kenneth was homebound.  He went outside only once.  He left his brother's house only to be transported to a hospice shortly before he died.  He was completely dependent on his brother and sister-in-law for food, shelter, and medical care.

**X.      The Orphans' Court Proceedings**

After Kenneth's death, Malamis and Nelson sought to introduce the 2003 will to

18

probate, while Andrew Green sought to introduce the 2009 will. In his notice of judicial probate, Andrew specifically asserted that Kenneth was domiciled in Allegany County at the time of his death.

On June 18, 2010, the orphans' court held a hearing for the purpose of admitting the 2009 will to probate. At the hearing, Andrew asserted that, although Kenneth's death certificate states that Allegany County was his usual residence, he had established a residence in Kentucky by the time of his death. Thus, Andrew asserted that the estate should be opened in Kentucky rather than Maryland. The orphans' court, however, unanimously decided that the estate should remain in Maryland. In so doing, the court accepted the 2009 will for probate and appointed Andrew to administer the estate.[17]

Andrew did not appeal the orphans' court's rejection of his argument that Kentucky, and not Maryland, was the appropriate forum for the proceedings to probate Kenneth's estate. He informed us at oral argument that he has taken no steps to open an estate in Kentucky.

### Y.    The Caveat Proceeding

On September 9, 2010, McClintock filed a petition to caveat the 2009 will, alleging that the will was procured as a result of fraud, undue influence, or duress imposed by Albert or Albert's other family members. In response, Andrew petitioned to

---

[17] The orphans' court noted that, according to Kenneth's death certificate, Allegany County was his usual residence.

transfer the caveat proceeding to the circuit court in accordance with Md. Rule 6-434. In his response, Andrew specifically stated that Rule 6-434 empowers the orphans' court "to transmit issues of fact within its jurisdiction for trial in the Circuit Court."

When the orphans' court transferred its record to the circuit court for the caveat proceeding, the register of wills certified that she had sent "the original papers as stated on the estate docket in the Estate of Kenneth William Green, late of Allegany County, Maryland."

As previously stated, after a lengthy bench trial, the Circuit Court for Allegany County held that the 2009 will was invalid because it was procured by fraud and undue influence. Andrew filed this timely appeal, in which he not only challenges several rulings at trial, but also whether Maryland had jurisdiction to adjudicate the validity of the will that he himself submitted to probate.[18]

## QUESTIONS PRESENTED

Andrew presents three questions for our review, which we have rephrased as follows:

> I.    Does Maryland lack subject matter jurisdiction over the estate of Kenneth Green?
>
> II.   Did the circuit court err in allowing Kenneth Green's

---

[18] Although the circuit court invalidated the will on grounds of fraud and undue influence, it rejected McClintock's contentions that Kenneth was incompetent when he made the 2009 will, that Kenneth did not execute the will, and that the will was the product of duress. McClintock has not challenged those conclusions.

former attorney, Nelson, to testify regarding
confidential communications made by Kenneth Green
with regards to the 2003 will?

III.   Was there sufficient evidence for the court to find that
the 2009 will was the product of fraud and undue
influence?

We find no error and, hence, shall affirm.

## DISCUSSION

## I.   <u>Maryland Has Jurisdiction</u>

Andrew submitted the 2009 will to probate in Maryland, specifically asserting that

Kenneth was domiciled in Allegany County at the time of his death.  As a consequence, a

Maryland probate court vested Andrew with the status of Kenneth's personal

representative.  As such, Andrew gained a number of procedural advantages in the

dispute with McClintock, including the right to assert Kenneth's attorney-client privilege

and the ability to require McClintock to bear the burden of proof in the caveat proceeding.

Andrew himself petitioned to transmit the caveat proceeding to the circuit court,

asserting, in support of his petition, that Md. Rule 6-434 empowered the orphans' court to

transmit contested issues of fact "within its jurisdiction."  Nonetheless, now that the

circuit court has ruled against him in that dispute, Andrew raises a preliminary issue that

he either chose not to raise or neglected to raise in the circuit court – whether Maryland

may exercise subject matter jurisdiction over Kenneth's estate.

It is tempting to hold that Andrew has either waived that issue (because of his

21

neglect) or is equitably estopped from raising it (because of his gamesmanship). A party, however, cannot waive an objection to a court's subject matter jurisdiction. *See, e.g., State v. Walls*, 90 Md. App. 300, 305 (1992). Moreover, just as parties are unable to agree to confer subject matter jurisdiction upon a court (*Stewart v. State*, 287 Md. 524, 527 (1980); *Walls*, 90 Md. App. at 305), so too are they unable to create subject matter jurisdiction by estoppel. *See, e.g.*, *StreetEasy, Inc. v. Chertok*, ___ F.3d ____, 2014 WL 2521472, at *5 (2d Cir. June 5, 2014) (citing *Williams v. United States*, 947 F.2d 37, 39 (2d Cir. 1991)). Indeed, because a court has no power to decide a dispute unless it has subject matter jurisdiction, a party can question the existence of subject matter jurisdiction at any time – even on an appeal in a case in which the existence of jurisdiction was neither raised nor decided below. *Harris v. Simmons*, 110 Md. App. 95, 113 (1996)*; Walls*, 90 Md. App. at 305. Consequently, we must consider Andrew's challenge.

Although Andrew frames his challenge in terms of subject matter jurisdiction, he does not explain why, in his view, the subject matter of this dispute falls outside the scope of what the orphans' court and circuit court were empowered to decide. He certainly does not raise a typical objection to subject matter jurisdiction, such as an objection that a court has decided a type of case that it is not empowered to decide (*e.g.*, an objection that a circuit court decided a replevin action, which lies within the exclusive original jurisdiction of the district court). Md. Code (2013 Repl. Vol.), § 4-401(2) of the Courts

22

and Judicial Proceedings Article. Nor does he complain that the court purported to exercise a power that has not been conferred upon it (*e.g.*, a complaint that a district court attempted to exercise general equity jurisdiction, which, by statute, *see id.* § 4-402(a), it does not have). In fact, in none of his arguments about subject matter jurisdiction does Andrew ever cite or discuss the statutory basis for probate jurisdiction in Maryland.

The basis for that jurisdiction is found in title 2, subtitle 1, of the Estates and Trusts Article. Under Md. Code (1974, 2011 Repl. Vol.), § 2-102(a) of the Estates and Trusts Article, the orphans' court "may conduct judicial probate, direct the conduct of a personal representative, and pass orders which may be required in the course of the administration of an estate of a decedent."[19] Furthermore, under Md. Code (1974, 2011 Repl. Vol.), § 2-105(b) of the Estates and Trusts Article, the orphans' court "shall" transmit issues of fact to "a court of law" upon "the request of an interested party" "made before the [orphans' court] has determined the issue of fact."[20] The courts in this case

---

[19] In full, § 2-102(a) provides:

(a) *Powers.* – The court may conduct judicial probate, direct the conduct of a personal representative, and pass orders which may be required in the course of the administration of an estate of a decedent. It may summon witnesses. The court may not, under pretext of incidental power or constructive authority, exercise any jurisdiction not expressly conferred.

[20] In full, § 2-105(b) provides:

(b) *Transfer of determination to law court.* – At the request of an interested person made within the time determined by the court, the issue of fact may be determined by a court of law. When the request is made before the court has

(continued...)

23

proceeded in precise accordance with these jurisdictional grants: the orphans' court conducted judicial probate proceedings (in response, in part, to the notice of judicial probate that Andrew had filed); the probate proceedings included the caveat petition that McClintock had filed; and at McClintock's request (and with Andrew's consent), the orphans' court transmitted the caveat case to the circuit court, a court of law, for a determination of the relevant factual issues. In these circumstances, it is not immediately clear how the Maryland courts have exceeded their subject matter jurisdiction.

Without citation to any authority, however, Andrew argues that in a probate case a Maryland court has subject matter jurisdiction only if the decedent was domiciled in Maryland at the time of his or her death. Andrew's argument is difficult to reconcile with Md. Code (1974, 2011 Repl. Vol.), § 5-103(a) of the Estates and Trusts Article, which specifically recognizes that a Maryland court can probate the estate of a person who was domiciled elsewhere at the time of his or her death, at least as long as the decedent owned property in Maryland at that time:

> The venue for administrative or judicial probate is in the county in which the decedent had his domicile at the time of his death, or, *if the decedent was not domiciled in Maryland*, the county in which the petitioner believes the largest part in value of the property of the decedent in Maryland was located at the time of his death.

*Accord Wright v. Nugent*, 23 Md. App. 337, 353 (1974), *aff'd*, 275 Md. 290 (1975) (per

---

[20] (...continued)
determined the issue of fact, the court shall transmit the issue to a court of law.

24

curiam) (holding that Talbot County was the proper venue for administrative probate of the estate of a decedent who was domiciled in the District of Columbia at the time of his death, because the petitioner for probate believed that the decedent's property in Talbot County represented the largest part in value of his property located in Maryland); *see also* Restatement (Second) of Conflicts of Law § 314 cmt. b (1971) (stating that, as a general rule, "[a]ny state has jurisdiction to admit a will to probate or to appoint an executor or administrator for a decedent").

In other words, if the decedent was domiciled in a particular county at the time of death *or* if the decedent had more property in that county than anywhere else in the State (in the belief of the person who petitions for probate), the orphans' court for that county is the proper venue for probate proceedings. But because a court can be a proper venue only if it has jurisdiction, jurisdiction cannot depend solely on whether the decedent was domiciled in Maryland at the time of his or her death: the court may also have jurisdiction if the decedent simply had property in Maryland at the time of death. *See Kortobi v. Kass*, 182 Md. App. 424, 431 (2008), *aff'd*, 410 Md. 268 (2009) (stating that the State may subject all property within its borders to its laws).

Both parties urge us to decide where Kenneth was domiciled at the time of his death. The issue of domicile, however, requires a fact-intensive inquiry into Kenneth's intentions (*see Blount v. Boston*, 351 Md. 360, 367-73 (1998)), which the circuit court was not asked to conduct, and which it would be inappropriate for an appellate court to

25

conduct in the first instance. *Cf. Von Dunser v. Aronoff*, 915 F.2d 1071, 1072-76 (6th Cir. 1990) (where party challenged subject matter jurisdiction for first time on appeal by raising issue of domicile, and thus of diversity of citizenship, court remanded for factual determination regarding domicile).

Furthermore, although it is fairly clear that Kenneth owned at least some property in Allegany County at the time of his death,[21] we need not decide whether Maryland had jurisdiction over his estate on that ground: the orphans' court rejected Andrew's challenge to its jurisdiction at the outset of the case, and Andrew failed to exercise his right to appeal that ruling. Hence, the orphans' court's ruling operates as collateral estoppel on the issue of jurisdiction. *Tucker v. Tucker*, 35 Md. App. 710, 712-15 (1977).

In *Tucker*, 35 Md. App. at 711, Mr. Tucker moved to revise a divorce decree that obligated him to pay his ex-wife's medical expenses and those of their minor children. In support of his motion, Mr. Tucker contended that the court had lacked jurisdiction to enter that portion of its decree. *Id.* The circuit court disagreed, and Mr. Tucker failed to appeal – nor, apparently, did he pay the expenses. *Id.* Instead, in a subsequent proceeding, in which his ex-wife sought to have him held in contempt, he attempted to reassert his jurisdictional argument. *Id.* The circuit court declined to entertain the

---

[21] The record discloses that Malamis or McClintock possessed a number of Kenneth's savings bonds, which were payable to McClintock upon death. Thus, even assuming the validity of the conveyance of Kenneth's farm to Albert for no consideration, the sale of Kenneth's cattle, and the liquidation of Kenneth's accounts, Kenneth owned some property in Maryland at the time of his death.

26

argument, and this Court affirmed, stating that "principles of res judicata apply to a jurisdictional question when that question has actually been raised, litigated and determined in favor of jurisdiction." *Id.* at 713.

These same principles apply in this case. When the orphans' court rejected his jurisdictional challenge to a Maryland court's power to administer Kenneth's estate, Andrew had the right to appeal either to this Court[22] or to the circuit court,[23] because the ruling was a "final judgment" in the context of the probate proceedings. *Wright v. Nugent*, 23 Md. App. at 357-58 (a party may appeal from the orphans' court's determination that it has jurisdiction over an estate and that it may admit a will to probate, because the determination is a "final judgment" for purposes of probate proceedings); *see also Pattison v. Firor*, 146 Md. 243, 249 (1924) (a party may appeal from the orphans' court's denial of a petition contending that the decedent had not resided in the jurisdiction

---

[22] Md. Code (1973, 2013 Repl. Vol.), § 12-501(a) of the Courts and Judicial Proceedings Article. Section 12-501(a) states that "[a] party may appeal to the Court of Special Appeals from a final judgment of an orphans' court."

[23] Md. Code (1973, 2013 Repl. Vol.), § 12-502(a) of the Courts and Judicial Proceedings Article. Section 12-502(a) states that, "[i]nstead of a direct appeal to the Court of Special Appeals pursuant to § 12-501 of this subtitle, a party may appeal to the circuit court for the county from a final judgment of an orphans' court." Section 12-502 does not apply in Harford County and Montgomery County, where the circuit court sits as the orphans' court. The appeal to the circuit court must be heard *de novo* and must "be treated as if it were a new proceeding and as if there had never been a prior hearing or judgment by the orphans' court." *Id.,* § 12-501(a)(1)(ii)-(iii). In addition, the circuit court must "give judgment according to the equity of the matter." *Id.,* § 12-501(a)(1)(iv).

27

and thus that the court should not issue letters testamentary or of administration).[24]

Indeed, Andrew was not only permitted to appeal the ruling on jurisdiction, but he was required to appeal if he continued to dispute the court's power to administer the estate. Once a probate court has rebuffed a challenge to its jurisdiction, as it did here, the court (and interested parties) are entitled to act in reliance upon that decision in disbursing estate assets to creditors, professionals, and (in some estates) perhaps even some beneficiaries. Thus, if a party, like Andrew, could challenge the court's jurisdiction after it had authorized those sorts of disbursements, the party could create great uncertainty in estate administration by threatening to invalidate the court's actions long after they had occurred. It follows that if an orphans' court rejects a party's challenge to its jurisdiction, the party must immediately exercise its right to appeal, and must prevail on its appeal, or else he or she will be barred from raising future challenges to the court's jurisdiction.[25]

---

[24] As Maryland courts have repeatedly recognized, the concept of an appealable "final judgment" for purposes of orphans' court proceedings is very different from the concept of a final judgment in conventional civil litigation. *See, e.g., Banashak v. Wittstadt*, 167 Md. App. 627, 656-58 (2006); *Hegmon v. Novak*, 130 Md. App. 703, 709 (2000) (referring to the "unusual definition of a 'final judgment'" in orphans' court proceedings).

[25] In most civil proceedings, "'a trial court's order denying a challenge to its jurisdiction is a nonappealable interlocutory order.'" *Maryland State Bd. of Educ. v. Bradford*, 387 Md. 353, 384 (2005) (quoting *Gruber v. Gruber*, 369 Md. 540, 547 (2002)). This approach serves "the very purpose of the final judgment rule, which is to avoid piecemeal appeals that create inefficiencies in both the appellate and trial courts." *Id.* In probate proceedings, however, the interests of efficiency are often better served by permitting some immediate appeals, and thus a modified final judgment rule applies. *See Schlossberg v. Schlossberg*, 275 Md. 600, 612 (1975) (explaining that the appealable final

(continued...)

Andrew may have failed to appeal the orphans' court's ruling because he was unaware of his appellate rights. Or he may have failed to appeal because he was willing to forgo his rights in light of the court's acceptance of what was, in effect, his alternative argument, that he should be the personal representative if the estate were to be administered in Maryland. In either case, however, collateral estoppel bars him from relitigating the issue of jurisdiction after it had been "raised, litigated and determined" against him in a final, appealable judgment, from which he had the right to appeal (*Wright v. Nugent*, 23 Md. App. at 357-58), but from which he failed to appeal. *Tucker*, 35 Md. App. at 713. Accordingly, we reject Andrew's attack on the circuit court's exercise of subject matter jurisdiction.

## II. The Circuit Court Did Not Commit Prejudicial Error in Permitting Kenneth's Attorney to Testify About Kenneth's Estate Plan

Andrew argues that the circuit court erred when it allowed Kenneth's attorney, Nelson, to testify about communications with Kenneth about his estate planning and the preparation of the 2003 will and about a communication with Kenneth after Albert and Andrew had taken him to Kentucky. Andrew complains that the court violated Kenneth's attorney-client privilege, which Andrew, as personal representative, was entitled to assert. We see no error, and certainly no prejudicial error.

_____

[25] (...continued)
judgments of an orphans' court are "those judgments, orders, decisions, etc. which, in caveat proceedings, finally determine the proper parties, the issues to be tried and the sending of those issues to a court of law").

Kenneth undoubtedly had an attorney-client relationship with Nelson, at least in connection with the 2003 will and the limited power of attorney that he drafted for Kenneth while he was hospitalized in Maryland in August 2009. Hence, the attorney-client privilege potentially applies at least to some communications between Kenneth and Nelson. *See, e.g., Zook v. Pesce*, __ Md. __ , No. 75, Sept. Term, 2013, Slip Op. at 7-8 (Ct. of App. May 16, 2014); *Greenberg v. State*, 421 Md. 396, 408-09 (2011); *E.I. du Pont de Nemours & Co. v. Forma-Pack, Inc.*, 351 Md. 396, 414-15 (1998); *Harrison v. State*, 276 Md. 122, 134-35 (1975).

Maryland has adopted Wigmore's definition of the attorney-client privilege:

(1) Where legal advice of [any] kind is sought, (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence, (5) by the client, (6) are at his insistence permanently protected, (7) from disclosure by himself or by the legal adviser, (8) except the protection [may] be waived.

*See, e.g., Harrison*, 276 Md. at 135 (quoting 8 John H. Wigmore, Wigmore on Evidence § 2922, at 554 (McNaughton rev. ed. 1961); *accord Greenberg*, 421 Md. at 409; *Forma-Pack*, 351 Md. at 415.

Nonetheless, the Court of Appeals has cautioned that, "because the application of the attorney-client privilege withholds relevant information from the fact finder, the privilege contains some limitations and should be narrowly construed." *Forma-Pack*, 351 Md. at 415.

Within its proper bounds, the attorney-client privilege will survive the client's

30

death. *See Zook*, 2013, Slip Op. at 7-8; *Trupp v. Wolff*, 24 Md. App. 588, 609 (1975).

Ordinarily, therefore, an attorney may not disclose a client's confidential communications

even after the client dies. *Trupp*, 24 Md. App. at 609. As the Supreme Court has

explained, "Knowing that communications will remain confidential even after death

encourages the client to communicate fully and frankly with counsel" without concern

about "reputation, civil liability, or possible harm to friends and family." *Swidler &

Berlin v. United States*, 524 U.S. 399, 407 (1998); *accord Zook*, Slip Op. at 8.

But despite the general rule of continued confidentiality after death, Maryland

recognizes a "testamentary exception" to the attorney-client privilege. That exception

establishes that, "in a dispute between putative heirs or devisees under a will or trust, the

attorney-client privilege does not bar admission of testimony and evidence regarding

communication between the decedent and any attorneys involved in the creation of the

instrument, provided that evidence or testimony tends to help clarify the donative intent of

the decedent." *Zook*, Slip Op. at 10; *see Benzinger v. Hemler*, 134 Md. 581, 586 (1919).

Andrew concedes the existence of the testamentary exception, but contends that it

applies only to the will that is being contested – *i.e.*, in this case, to the 2009 will. Hence,

he contends that the circuit court erred in permitting Nelson to testify about Kenneth's

intentions in regard to his earlier will and estate plan. In *Zook*, however, the Court of

Appeals rejected a similar contention. *Zook*, Slip Op. at 20.

In that case, the beneficiary of a trust alleged that her sister had exercised undue

31

influence over their father, the settlor, in inducing him to revise the trust shortly before his death. *Zook*, Slip Op. at 1-4. Because a change in the father's estate plan could constitute proof of undue influence (*see Moore v. Smith*, 321 Md. 347, 353 (1990)), the beneficiary sought to discover and to introduce the earlier trust. *Zook*, Slip Op. at 5. The Court of Appeals held that it was error (though not reversible error in the circumstances of that case) for the circuit court to bar the discovery and introduction of the earlier trust. *Id.*, Slip Op. at 20. In view of the allegations of undue influence in this case, therefore, it might well have been error for the circuit court *not* to have permitted testimony about Kenneth's intentions before he radically altered his estate plan in adopting the 2009 will. *See id.*; *accord In re Everett's Will*, 105 Vt. 291, 166 A. 827, 835 (1933) (holding that "evidence of previous wills, executed or unexecuted, was admissible" in determining whether there was undue influence in procuring a later will).

In any event, even if the circuit court erred in allowing Nelson's testimony about the 2003 will, we would still affirm, because the testimony was cumulative and thus harmless. *See Zook*, Slip Op. at 20 (to obtain reversal, an appellant "must not only show error but must demonstrate that the error was prejudicial"). In his testimony concerning the 2003 will, Nelson focused on three matters: (1) Kenneth's intention to give his estate to McClintock; (2) his antipathy toward his sister-in-law, Stella; and (3) his approval of the option in favor of Maryland Fuel. Yet, other witnesses, including McClintock, Kiddy, Malamis, and Oberhaus, gave similar testimony concerning these same matters. For

32

instance, Malamis testified that, when Kenneth executed the will at an M&T Bank branch office in 2003, he told her and a bank employee why he wanted to give his estate to McClintock and explained his disdain for Stella. Similarly, Oberhaus testified that Kenneth "was agreeable" to the option in favor of Maryland Fuel. Indeed, the 2003 will itself evidences Kenneth's intention to give his estate to McClintock and to grant the option.

As a separate and final matter, while Andrew also objected to Nelson's testimony about a September 2009 conversation in which Kenneth asked him whether "everything is still okay" with his property and his will, we think that the testimony also falls well within the testamentary exception. In particular, the testimony "helps to clarify the donative intent of the decedent," *Zook*, Slip Op. at 10, as it suggests that Kenneth had no idea at the time that he had changed his will (or that Andrew had used a power of attorney to convey the farm to Albert). The circuit court, therefore, did not err in permitting Nelson to testify about that conversation.

III. **The Record Contains Sufficient Evidence to Support the Circuit Court's Findings of Fraud and Undue Influence**

In his final challenge, Andrew argues that there was insufficient evidence to support a finding of fraud or undue influence. In view of the abundance of evidence that Andrew and Albert employed false pretenses to abduct their dying relative from Maryland and then held him, incommunicado, in Kentucky, where he was housebound, highly medicated, and completely dependent on them for sustenance and support, we disagree.

33

In examining Andrew's argument, we must employ two different standards of review.  First, we must evaluate whether the record contains sufficient evidence to support the circuit court's factual findings.  Then, we must evaluate whether those factual findings support the conclusion that the will was the product of fraud or undue influence.

We review the circuit court's factfinding under the clearly-erroneous standard, under which the findings will not be overturned unless there is no competent and material evidence to support them.  *See, e.g.*, *L.W. Wolfe Enters.*, 165 Md. App. at 343.

A.      **Undue Influence**

We shall first address the sufficiency of the evidence to support the circuit court's conclusion regarding undue influence.

The Court of Appeals has stated that, "'[g]enerally, undue influence amounts to physical or moral coercion that forces a testator to follow another's judgment instead of his own.'" *Zook*, Slip Op. at 16 (quoting *Moore*, 321 Md. at 353).  To be "undue," the influence must be "'unlawful,'" "'on account of the manner and motive of its exertion, and must be exerted to such a degree as to amount to force or coercion, destroying free agency.'" *Zook*, Slip Op. at 17 (quoting *Koppal v. Soules*, 189 Md. 346, 351 (1947)); *accord Moore*, 321 Md. at 353 (quoting *Nalley v. Nalley*, 253 Md. 197, 202 (1969)).  The caveator bears the "heavy" burden of establishing undue influence (*Zook*, Slip Op. at 17), but "the quantum of proof necessary to establish undue influence varies according to the susceptibility of the testator." *Moore*, 321 Md. at 360.

Although the Court of Appeals has "not laid down a test to determine the existence of undue influence with mathematical accuracy," *Moore*, 321 Md. at 353, it "has recognized the following list of elements characteristic of undue influence" (*Zook*, Slip Op. at 16):

1. [t]he benefactor and beneficiary are involved in a relationship of confidence and trust;

2. [t]he will contains substantial benefit to the beneficiary;

3. [t]he beneficiary caused or assisted in effecting execution of will;

4. [t]here was an opportunity to exert influence;

5. [t]he will contains an unnatural disposition;

6. [t]he bequests constitute a change from a former will; and

7. [t]he testator was highly susceptible to the undue influence.

*Id.*, Slip Op. at 16; *Moore*, 321 Md. at 353.

A caveator need not prove the presence of all seven of these factors, *Orwick v. Moldawer*, 150 Md. App. 528, 534 (2003), but the first and seventh factors (relationship of confidence and trust, and high susceptibility to undue influence) do appear to be necessary conditions for a finding of undue influence. *See id.* at 533-34; *see Upman v. Clarke*, 359 Md. 32, 49 (2000) (affirming a finding of no undue influence where the evidence showed no abuse of a confidential relationship); *Anderson v. Meadowcroft*, 339 Md. 218, 229 (1995) (affirming the dismissal of a complaint alleging undue influence where the pleading did not contain sufficient allegations of the testator's

35

high susceptibility to influence).

Nearly all of the factors are present in this case, including the essential first and seventh factors.

As for the first factor, a confidential relationship exists when "'two persons stand in such a relation to each other that one must necessarily repose trust and confidence in the good faith and integrity of the other.'" *Upman*, 359 Md. at 42 (quoting *Green v. Michael*, 183 Md. 76, 84 (1944)). "[D]ependence" is "the key factor" in the existence of a confidential relationship. *Id.* at 41 (citing *Green*, 183 Md. at 84).

Here, there is no question that Albert and Kenneth were in a relationship of trust and confidence and thus that the crucial first factor is satisfied. After Albert and Andrew took Kenneth from the hospital in Maryland to Albert's house in Kentucky, he was in what the circuit court found to be a "severely weakened condition" – dying of cancer that had metastasized through his body, on "opiates for pain," "house bound" [sic], and "totally dependent upon his brother and Stella for food, personal hygiene and a roof over his head." Kenneth was also dependent on his brother and nephew to manage his finances, having given them the powers of attorney that they used to convey his farm to Albert (for no consideration), sell his cattle, and liquidate his accounts. *See Moore*, 321 Md. at 358 ("[i]n light of the intimate nature of [the testator's] physical limitations and reliance on [the defendant] to attend his personal and physical needs, as well as [the testator's] financial affairs, the development of a confidential relationship was

36

inevitable"). Even Andrew concedes that there was a relationship of trust between the brothers.[26]

The analysis is similar for the crucial seventh factor (high susceptibility to influence). Kenneth's advanced illness, the pain medications that he took, his almost-total immobility, and his abject dependence on Albert and his family "created a perfect setting over which someone could take advantage." *Moore*, 321 Md. at 357. Worse yet, Albert and his family members cut off Kenneth's ability to communicate with his friends and acquaintances in Maryland, including McClintock, thereby further isolating him and rendering him even more susceptible to influence. Hence, not only was this second factor clearly satisfied, but Kenneth's confirmed susceptibility has the effect of diminishing the "quantum of proof" that McClintock would otherwise have to establish. *Id.* at 360.[27]

The second and third factors are satisfied as well. Regarding the second factor, the will contains substantial benefits for Albert because it grants him the entire estate. Regarding the third, Albert assisted in executing the will by putting Andrew in contact

---

[26] He merely disputes the finding that this trust was abused.

[27] While Andrew challenges the court's findings that Kenneth was cut off from his Maryland contacts and about the medications he took, we cannot say that the court was clearly erroneous. Andrew does not dispute that Kenneth received a total of only two phone calls over the course of five months from friends who had previously visited him in the hospital nearly every day. Nor can Andrew dispute the evidence that at least two of these people tried to reach him on multiple occasions. Furthermore, even though Andrew is correct that Kenneth was on only two opiates (fetanyl and oxycodone), instead of three (fetanyl, oxycodone, and morphine), it does not change the fact that he was highly medicated and highly susceptible to influence.

with the lawyer who drafted it, picking up the will from the lawyer, and having Andrew

arrange for witnesses and a notary to be present at the signing of the will. *See Moore*, 321

Md. at 359 (finding undue influence in part because the caveatee arranged for the attorney

who prepared the new will).

For the fourth factor, Albert had the opportunity to exert influence because

Kenneth was secluded in Kentucky, immobilized in a hospital bed, housebound in

Albert's and Stella's home, and highly medicated. In fact, the court's findings imply that

Albert did not merely have the opportunity to exert influence, but that he did exert it –

by, for example, spiriting Kenneth away to Kentucky on the false pretense that he would

return in two weeks, having his son use a power of attorney to convey Kenneth's farm to

him for no consideration, moving Kenneth's assets into a joint account of which he was

the co-owner, and using Kenneth's funds to construct an addition on his house. The

fourth factor also weighs in favor of a finding of undue influence.

The fifth factor tends to weigh against a finding of undue influence, because the

2009 will contains a "natural" disposition in the sense that it gives Kenneth's property to

a family member. *See Rowe v. Rowe*, 124 Md. App. 89, 94 (1998) ("[i]n Maryland, there

exists a common law presumption against disinheritance of . . . next of kin").

Nonetheless, given Kenneth's antipathy toward Albert's wife, his struggle to win the farm

from his brother in the litigation over their mother's estate, his continued frustration about

that struggle (as reported to his neighbor, Kiddy), his reported statement to Albert in as

38

late as May 2009 that Albert would not inherit the farm, and his long-term, stable, caring, and supportive relationship with McClintock, a sudden decision to divest McClintock and to give his entire estate to his brother could be construed as unusual. Consequently, this factor is neutral at best; it is certainly not dispositive in Andrew's favor.

Finally, for the sixth and last factor, the will is completely changed from the 2003 will, which gave McClintock the entirety of the estate. *See Moore*, 321 Md. at 358 (affirming a finding of undue influence in part because of an abrupt change in a longstanding plan). While Andrew attacks the legitimacy of the earlier will, that issue was not before the circuit court, nor is it before us.

In summary, based on the circuit court's central findings, which have not been shown to be clearly erroneous, a reasonable factfinder, viewing the facts in the light most favorable to McClintock, could conclude that the will resulted from the exertion of undue influence by Albert and his family members. Accordingly, we reject Andrew's challenge to the sufficiency of the evidence supporting that conclusion.

### B. Fraud

Lastly, we turn to the issue of fraud, which, in a will contest, a caveator is required to prove only by a preponderance of the evidence, and not by the higher standard of clear and convincing evidence that applies to common-law fraud. *See Krouse v. Krouse*, 94 Md. App. 369, 378 (1993) (citing *Griffith v. Diffenderfer*, 50 Md. 466, 489 (1879)).

Andrew argues that, in a will contests, fraud occurs only when someone deceives

the testator about the will's provisions or when the testator does not know that he or she is signing a will (as opposed to some other kind of document). Thus, he argues that fraud in the inducement will not suffice to invalidate a will. His position is inconsistent with longstanding principles of Maryland law.

In *Tufts v. Poore*, 219 Md. 1, 15 (1959), the Court of Appeals affirmed a jury verdict that invalidated a will on grounds of fraud in the inducement. In that case, the testator, Mrs. Poore, had originally executed a will that gave her 14-acre estate to her daughter, Nancy Poore Tufts, for life, with the remainder to her granddaughter, Suzanne Poore. *See id.* at 6. The daughter, Tufts, knew of her mother's plans and was embarrassed that she would receive the estate only for her life (evidently because her family members might regard it as a kind of slight). *See id*. at 9. Consequently, Tufts promised her mother that if she changed her will to give Tufts the estate in fee simple, Tufts would simultaneously execute a will by which she would convey her interest, at death, to the granddaughter Suzanne. *See id.* (she "would simultaneously execute and continue in existence of will of her own which would accomplish substantially the same disposition of her mother's estate"). Tufts "made the promise with a present intention not to perform the agreement," *id.* at 10, which amounts to fraud in the inducement. *Id.* at 10-11. In fact, while Tufts did execute a will, she did not deliver it to the bank with her mother's will, but retained possession of it and later destroyed it (*id.* at 9), never telling her mother "that the will was destroyed." *Id.* at 8. On these facts, the Court of Appeals

40

held that the circuit court properly submitted the issue of fraud to the jury.  *Id*. at 11, 12.

In reaching that decision, *Tufts* cited and quoted *Davis v. Calvert*, 5 Gill & J. 269 (1833).  In that case, the Court of Appeals reversed the verdict in a caveat proceeding because the court had excluded evidence that the defendants had deceived the testator into believing that he had fathered the children for whom he provided in the will.  It would appear, therefore, that the doctrine of fraudulent inducement is not a recent development in will contests in Maryland.[28]

Under *Tufts* and *Davis*, McClintock generated sufficient evidence of fraud.  Based on the trial court's findings, Andrew and Albert falsely asserted that McClintock stole Kenneth's money in order to deceive Kenneth and to make him change his will and disinherit McClintock.  While Andrew and Albert deny that those statements were false, we defer to the judgment of the trial judge on the credibility of witnesses.  *Morris v. State*, 153 Md. App. 480, 489 (2003).  The trial judge chose to believe McClintock when she stated that she closed Kenneth's bank account and sold off his assets only at his behest.

---

[28] Consistent with this long lineage, the Maryland Civil Pattern Jury Instructions recognize fraudulent inducement as a ground for invalidating a will.  MPJI-Cv 29:5 ("[f]raud means that a false representation was made to the maker of the will by another person who knew the representation was false and who made the representation with an intent of deceiving the maker"); *see also Krouse v. Krouse*, 94 Md. App. 369, 375-78 (1993) (affirming a finding of fraud in a case in which the court employed the pattern jury instruction concerning fraudulent inducement as a ground for invalidating a will); Restatement (Second) of Property, Donative Transfers, § 34.7 cmt. c (1992) (a fraudulent transfer may occur if a person makes "fraudulent representations [that] cause the donor not to make a donative transfer that the donor would otherwise have made and instead makes the donative transfer to someone else").

Thus, because the judge found Andrew's and Albert's statement to be false, and because it was clearly aimed at turning Kenneth against McClintock, it is sufficient to support a finding fraud.

<u>CONCLUSION</u>

In summary, we hold that the Maryland courts have subject matter jurisdiction over Kenneth's estate; that the circuit did not err in admitting Nelson's testimony concerning Kenneth's intentions in regard to his 2003 will or, in the alternative, that any error was harmless because the testimony was cumulative; that the circuit court did not err in admitting Nelson's testimony concerning his September 2009 testimony with Kenneth; and that the circuit court was not clearly erroneous in finding the 2009 will to be invalid on grounds of fraud and undue influence. Accordingly, we affirm the judgment below.

**JUDGMENT OF THE CIRCUIT COURT FOR ALLEGANY COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**

42